No. 29,589.

Lloyd H. Hilton, *Appellee*, v. The Sheridan Coal Company, *Appellant*.

(297 Pac. 413.)

Opinion filed March 7, 1931.

*C. O. Pingry, P. E. Nulton* and *G. L. Stevenson,* all of Pittsburg, for the appellant.

*Sylvan Bruner,* of Pittsburg, *O. C. Mosman, Clay C. Rogers* and *Paul A. Buzard,* all of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages for wrongfully inducing plaintiff's employer to discharge him.

The significant facts, in brief, were these: The defendant, The Sheridan Coal Company, owned eleven coal mines in southeastern Kansas, one of which was familiarly known as No. 19 Sheridan. Defendant leased this mine to three partners, Cunningham, Giovanni and Steele, who operated it under the name of the C. & G. Coal Company. About 190 workmen were employed in and about this mine. One of these was this plaintiff, Lloyd H. Hilton, aged 25 when this lawsuit was tried. He had been a coal miner for seven or eight years. In 1925, in the course of his employment, Hilton received an injury to his right foot and ankle, and on account thereof he received compensation from his employers, the C. & G. Coal Company, of some $2,000 in cash and an award of $6 per week for permanent partial incapacity. Prior to his injury plaintiff's task in the coal mine had been "tailing a motor"—whatever that is. When he returned to work his employers gave him the job of running a motor which relieved him from standing on his injured foot and gave him better pay—$8 per day instead of $7.50, his former wages.

This defendant, notwithstanding it had leased this coal mine where plaintiff was employed to the C. & G. Coal Company, exercised a good deal of supervisory authority over the mine and over its lessees. Defendant's superintendent of mines, one Ed. Roberts, instructed the mine surveyors where entries should be made, gave directions about the employment and discharge of C. & G. workmen, repeatedly reminded the lessees that the coal operators and insurance carriers had agreed to rid the southeastern Kansas coal field of all "compensation hounds"—meaning workmen who had been hurt in the mines and had received awards therefor under the workmen's compensation act. Roberts repeatedly warned the lessees that if they employed such workmen their insurance would be canceled, and if they did not carry insurance, as their lease contract obligated them to do, their lease would be canceled by the defendant coal company.

Not long after plaintiff Hilton returned to work following his

injury and award of compensation, Superintendent Roberts of the defendant company had a conversation with Cunningham, one of the lessees, employers of plaintiff. Cunningham testified:

"He said, 'How is Hilton doing?' I said, 'He is doing just fine.' So he said, 'Well, Tom, I am afraid you are going to have to get rid of him.' I said, 'Why?' He said, 'The insurance company is going to cancel your policy.' He used this language: He said that, 'The state law provides that you must carry insurance.' I said 'Yes.' He said, 'We have a section in the lease that you must carry it.' I said, 'Ain't I complying with it?' He said, 'But I am telling you that you must get rid of that fellow.' He said, 'The insurance company will make you.' He said, 'The operators and the insurance companies are going to clean Kansas out of these compensation hounds.'"

Plaintiff's employers were reluctant to discharge him and his retention was the subject of repeated bickerings with Roberts. Cunningham testified:

"Mr. Roberts said . . . 'You have got that old compensation hound back here again, have you?' I said, 'The boy is suiting me all right; he is doing his work all right.' . . . About a month afterwards, he (Roberts) spoke to me about it. . . . He said, 'I see you still have young Hilton working here. Don't you know that the insurance companies won't allow you to keep him here?' I said, 'I don't see why. They settled with him and he is able to work. He is doing his work. He absolutely satisfies me. I have nothing against the boy.' . . . Roberts, Steele and I had a very heated conversation. He said if I didn't fire that man Hilton that my insurance would be taken away from me and my lease canceled. He said that he would see that the lease was canceled and that my insurance was taken away. He characterized young Hilton as a compensation hound, and he also referred to another man that I had there in the same way, and he forced me to fire another man by the name of William Brackston. . . . Every time he seen the Hilton boy, he would fly to pieces. He said that if I didn't discharge him that the Sheridan Coal Company would cancel my lease and I would also lose my insurance. . . .

". . . He said the operators and insurance companies in Kansas were going to get rid of all the compensation hounds."

It was also shown that shortly thereafter plaintiff's employers consulted about what they must do in view of Superintendent Roberts' threats, and under his coercion they discharged plaintiff.

Thereafter the young man made persistent but unsuccessful efforts throughout the entire southeastern Kansas coal district to obtain employment. After three years' enforced idleness as a coal miner, he brought this lawsuit.

On the issues joined, the cause was tried before a jury, which

returned a verdict in plaintiff's favor for $2,000 actual damages and $4,000 punitive damages.

Judgment was entered accordingly, and defendant appeals.

Error is assigned in the admission of evidence touching Roberts' statements that the coal-operating companies and insurance companies had gotten together and were going to get rid of the compensation hounds. Those statements were competent to show that Roberts' employer, the Sheridan Coal Company, was back of Roberts' conduct in coercing plaintiff's employers to discharge him. They were also competently probative to show why it was impossible for plaintiff to get other employment at his trade as a miner in the southeastern Kansas coal district.

It is urged, however, that there was no evidence to show that Roberts had authority to speak for the Sheridan Coal Company. Whoever happened to know the fact that the coal operators and insurance companies had decided to prevent the employment of workmen who had been awarded compensation would be a competent witness on that point. Moreover, it was sufficiently shown to carry the question of agency to the jury whether Roberts, defendant's superintendent of mines, had authority to speak and act for the Sheridan Coal Company, and the fact that such authority was denied was not conclusive. It is not common in damage suits that responsibility of an employer for the tortious act of his employee can be proved by formal grant of authority. Ordinarily it has to be established by significant facts and relevant circumstances. In *Wilson v. Haun,* 97 Kan. 445, 155 Pac. 798, it was said:

"To establish the relation of agency an express appointment and an acceptance thereof is not essential, but it may be implied from other facts, such as the statements of the parties, their conduct and the relevant circumstances." (Syl. ¶ 1.)

See, also, *Fritchen v. Mueller,* ante, p. 491.

Defendant's next contention is a much more candid one than the error based on the argument that Superintendent Roberts had no authority to speak and act for the defendant in procuring plaintiff's discharge. It is that the defendant had a right to insist on the discharge of Hilton because the insurance on its coal mine would be canceled if men drawing disability allowances were permitted to work in it, and that defendant had a right to insist that nothing be done or omitted around the mine to jeopardize its insurance coverage. To approve that argument would be to admit that employers

of labor in dangerous industries have found a legitimate way to set the workman's compensation law at defiance and render nugatory its humane provisions. The legislature declares what the public policy shall be towards the employing of workmen in dangerous occupations like coal mining. It provides that injuries to workmen in that hazardous business shall be a charge upon the industry and added to the price of coal and eventually paid for by the general public who buy and burn coal. If the coal operator can get an insurance company to carry the risks of injuries to his workmen more economically than he can himself, well and good; if he cannot, the public policy does not change, but remains as the legislature declared it. The idea that the humane purposes of the workmen's compensation act can be set at naught by arbitrary action of employers and insurance carriers, or by either of them, and that unfortunate workmen who have received compensation for injuries sustained in their dangerous occupation shall be barred from reëmployment, cannot be given judicial countenance. Whatever the attitude of the insurance carriers, defendant knew that plaintiff was entitled to return to work after recovering from his injuries. It knew his employers had a right to employ him; its superintendent of mines had no right to compel its lessees to discharge him. In short, defendant must be presumed to have known that the theory underlying the entire jurisprudence of this state is that its people shall be free from vexatious oppressions and petty tyrannies such as its superintendent of mines practiced on this plaintiff, and it must have known that such a course of conduct to flout the declared legislative policy was likely to bring disagreeable consequences to those who would pursue it.

While an employer may discharge his employee not hired for a specified term for any reason or for no reason (*Coppage v. Kansas*, 236 U. S. 1), third parties have no such privilege, and they are liable in damages for such meddlesome interference if the discharge of an employee is procured thereby. In the leading case of *London Guarantee Co. v. Horn*, 206 Ill. 493, 99 A. S. R. 185, the appellant insurance company, by threatening to cancel a policy of insurance it had issued to the employer of Horn, appellee, brought about Horn's discharge. Under Horn's contract of employment he might be discharged at any time at his employer's unconstrained discretion. In the opinion affirming a judgment for damages in

Horn's behalf against the insurance company, various instructive cases are reviewed, and the court said:

"We therefore conclude, both upon reason and authority, that where a third party induces an employer to discharge his employee who is working under a contract terminable at will, but under which the employment would have continued indefinitely, in accordance with the desire of the employer, except for such interference, and where the only motive moving the third party is a desire to injure the employee and to benefit himself at the expense of the employee by compelling the latter to surrender an alleged cause of action, for the satisfaction of which, in whole or in part, such third party is liable, and where such right of action does not depend upon and is not connected with the continuance of such employment, a cause of action arises in favor of the employee against the third party." (p. 507.)

In *Carter v. Coal & Coke Co. et al.*, 84 W. Va. 624, the action was against the defendant company for causing plaintiff to be discharged from the service of his employer. It was there held that one who by himself or conspiring with others induces another to break his contract of employment with a third person, to the injury of that person, is liable in damages for the injury sustained by him, whether the injury done was for the benefit of the wrongdoer or not.

*United States Fidelity & Guaranty Co. v. Millonas*, 206 Ala. 147, is quite similar to the case at bar. The plaintiff, John Millonas, suffered an injury to his eye while working as a sheeter for a construction company. He placed his claim for compensation in the hands of an attorney for collection. The defendant company carried the compensation insurance for the employer of Millonas. Its agent offered to settle the claim for compensation by paying a nominal sum, $50. At the same time he warned plaintiff's attorney that he would have plaintiff discharged, and stated in the presence of several witnesses that it was the policy of defendant to have the employer who had insurance with it to discharge any employee who placed his claim in the hands of an attorney. Millonas was discharged and brought this action for damages. In sustaining a judgment in his favor for actual and punitive damages (reduced to $6,000 by remittitur), the Alabama supreme court reviewed the pertinent cases, including the Horn case, *supra*, and noted particularly that the supreme court of the United States cited with approval the doctrine of the Horn case in *Truax v. Riach*, 239 U. S. 33, 60 L. Ed. 131.

In *Johnson v. Ætna Life Ins. Co.*, 158 Wis. 56, it was held that

an insurance company which had insured an employer against liability for injuries sustained by the latter's workmen was not justified in causing the discharge of an employee who, after being injured, had been retained in his employment, where the purpose was to deprive the employee of his earning power so that he could not successfully carry on an action which he had brought against his employer, and in which the insurance company was defendant, to recover damages for his injury. In the opinion it was said:

"As against all others (like the appellant), the plaintiff (employee) was entitled to go his way without molestation, and if anyone assumed to meddle in his affairs he did so at his peril. There is practically little conflict in the cases on this point. (Citations.)" (p. 60.)

Other cases in accord with the Horn and Millonas cases, *supra*, are: *Railway Conductors v. Jones,* 78 Colo. 80; *Chipley v. Atkinson,* 23 Fla. 206; *Moran v. Dunphy,* 177 Mass. 485, 52 L. R. A. 115; *Clarkson v. Laiblan,* 202 Mo. App. 682; *Huskie v. Griffon,* 75 N. H. 345, 27 L. R. A., n. s., 966 and Note; *Max v. Kahn,* 91 N. J. L. 170; *Malone v. B. of L. F. & E.,* 94 N. J. L. 347; *Carmen v. Fox Film Corporation,* 198 N. Y. Supp. 766; *Cotton v. Cooper* (Tex. Com. of App., approved by supreme court), 209 S. W. 135.

Error is assigned in the exclusion of testimony which defendant sought to elicit from Roberts, its superintendent, to the effect that he had no authority to direct the discharge of Hilton or other employees of the C. & G. Coal Company. This point is not subject to review, since the rejected evidence was not brought into the record in support of the motion for a new trial, as the code requires. (R. S. 60-3004, Civ. Code, § 307; *Braymer Mfg. Co. v. Midwest & G. Oil Corporation,* 118 Kan. 439, 235 Pac. 847.)

Appellant assigns error in the instructions given by the trial court, which, it contends, should have limited the amount of plaintiff's recovery to loss of wages necessarily caused by plaintiff's discharge and failure to find other employment. The cases of *Manross v. Oil Co.,* 107 Kan. 71, 190 Pac. 619, and *Millikan v. Shoe Co.,* 95 Kan. 327, 148 Pac. 660, are cited by appellant as supporting that view. Those were actions by employees against their own employers for wrongful discharge in breach of contract of employment. The element of exemplary damages was not involved, and the rules there stated are of no significance in the case at bar. Punitive damages may properly be assessed against an intermeddling third party

who causes an employee to be discharged, where legal malice or wanton disregard of the rights of the injured plaintiff are established. In *Cotton v. Cooper,* supra, a verdict of $400 actual damages and $3,500 exemplary damages was approved in a case similar to the one at bar. In the Millonas case, *supra,* a verdict which included actual and punitive damages against a third party, which by intermeddling caused the discharge of an employee under circumstances similar to those at bar, was subjected to a remittitur from $25,000 to $6,000 and permitted to stand at the latter figure. (See, also, 39 C. J. 1370-1377.)

Appellant argues that it was entitled to have an instruction covering its theory of the case. Its theory, or one of them, was that defendant was exercising a "contractual right" when it caused the discharge of plaintiff, and that in the exercise of that right it was not liable even though it acted with malicious motives. But as we have seen, defendant had no contractual, moral, or legal right to coerce the C. & G. Coal Company to discharge the plaintiff; and requested instructions formulated on the fallacious assumption that it had such right were properly refused. Other objections to the instructions given and refused have been carefully considered, but nothing sufficiently serious in them to warrant discussion can be discerned.

It is finally urged that the verdict was excessive. Appellant makes the point that in no event could plaintiff's actual damages have exceeded $200, since his wages were $10 per day and his employers went out of business within a few weeks after his discharge. This point is not tenable. The coal mine, No. 19 Sheridan, is still operating. It still employs about 190 workmen. But for the meddlesome interference of defendant, plaintiff might have continued in that employment, as did the other workmen at that coal mine. But for the oppressive agreement between defendant and the insurance carrier to drive the "compensation hounds" out of the southeastern Kansas coal district, plaintiff would have had no difficulty in obtaining other employment at his trade in that locality. The evidence shows that through the tortious intermeddling of defendant, plaintiff was deprived of employment for about three years. There are 313 working days in a year, and 939 working days in three years. Plaintiff was earning $8 per day when defendant forced his discharge. On such a calculation plaintiff made a *prima*

*facie* case of loss of wages amounting to $7,512. If he had even been permitted to work two days a week at his trade as a miner he would have earned $2,500. The jury allowed him $2,000, and exemplary damages of $4,000, an aggregate of $6,000. Neither in the amount of the judgment nor in the circumstances disclosed by the record does the error based on excessiveness of the verdict address itself with such force as to justify this court in interfering with it. (*Ellis v. Kansas City Public Service Co.*, 131 Kan. 555-559-561, 292 Pac. 939.)

The judgment is affirmed.