No. 34,079

MICHAEL HURLA, by His Next Friend, LOUIS HURLA, *Appellant*, v. CAPPER PUBLICATIONS, INC., ARTHUR CAPPER et al., *Appellees*.

(87 P. 2d 552)

Opinion filed March 4, 1939.

*E. R. Sloan, W. Glenn Hamilton, Floyd A. Sloan, Eldon R. Sloan,* all of Topeka, *Paul H. Ditzen,* of Kansas City, and *Albert M. Cole,* of Holton, for the appellant.

*T. M. Lillard, O. B. Eidson, Philip H. Lewis, Hugh T. Fisher, Irwin Snattinger,* all of Topeka, *M. A. Bender* and *H. Dean Shrader,* both of Holton, for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This action was for damages growing out of an automobile collision. The several defendants submitted demurrers to the evidence on the ground plaintiff had failed to prove a cause of action. The demurrers were sustained, and plaintiff appeals.

Plaintiff in his petition alleged that the defendants Arthur Capper and Capper Publications, Incorporated, operated several routes of the Topeka Daily *Capital* in the neighborhood of Delia, Kan.; that the defendant John Lane is the agent, servant and employee of the defendants Arthur Capper and the Capper Publications; that he collected subscriptions and delivered the Sunday edition of that paper under the control, supervision and direction of such defendants; that on September 26, 1937, John Lane had the paper delivered on the Delia routes by Orland Lane, Dewayne Zirkle and

Leo Hanrahan; that these parties were the acting agents, servants and employees of defendants Arthur Capper and Capper Publications. It was further alleged that on September 26, 1937, the Hurla family, in a Chevrolet coach, were driving east on a county highway; Francis Hurla was driving the car; the plaintiff was riding in the front seat beside the driver; Mr. and Mrs. Hurla and their daughter were riding in the back seat. At a point two miles east of Delia the county highway is intersected by a township road running north and south. At the intersection the Hurla car collided with a Ford V-8 car traveling north on the township road and driven by the defendant Zirkle. The Ford car was owned by the defendant John Lane. In the car with Zirkle at the time of the accident were Orland Lane and Leo Hanrahan.

As a result of the collision the plaintiff Michael Hurla suffered severe injuries, for which he asks damages.

The negligence charged is that Zirkle drove the Ford automobile on the township road at a high and dangerous rate of speed—at approximately 60 miles per hour—with a total disregard of the rights of life, limb and property of other persons using the highways; that Zirkle drove into the intersection after the car in which plaintiff was riding had entered the highway and had traveled more than half the distance across the intersection; that Zirkle drove into the intersection without sounding his horn or giving any warning of his intention so to do; that he failed to stop his car at the county highway, and failed to maintain a lookout for cars approaching on the county highway; that the brakes on the Ford car were in bad condition; that Zirkle was not a licensed driver and was driving the car in violation of the statutes.

It was charged that the defendant John Lane owned the Ford car and knew the brakes were defective; that he knew Zirkle was an incompetent, careless and reckless driver; that he carelessly and negligently permitted Zirkle, Orland Lane and Leo Hanrahan to use such defective car in the delivery of the Sunday issue of the Topeka Daily *Capital* for the defendants Arthur Capper and Capper Publications, Incorporated.

The first question presented is whether the court erred in sustaining the demurrers submitted by the defendants John Lane and Dewayne Zirkle to plaintiff's evidence.

The answer of the defendant John Lane specifically denied that he was agent, servant or employee of Arthur Capper, or Capper

Publications, Incorporated, or that his delivering of the newspapers was under the control or direction of those parties; denied that defendants Dewayne Zirkle, Orland Lane or Leo Hanrahan were his servants or employees, as alleged by plaintiff, and alleged that if Dewayne Zirkle was driving his car it was without his knowledge or consent; admitted that a collision occurred between the defendant's car and a car driven by Francis Hurla at the time and location alleged in the petition, but denied that the driver of the defendant's car or any person riding therein was guilty of any negligence that in any manner contributed to the accident. The answer alleged that the persons in the Hurla car were engaged in a joint enterprise; that if plaintiff received injuries from the collision they were occasioned by the negligence of Francis Hurla in operating the car and through plaintiff's negligence.

The defendant Zirkle, in his answer, admitted he was driving the car of John Lane when the collision occurred; alleged the accident was caused by the negligence of the driver of the Hurla car, and that the persons in the Hurla car were engaged in a joint enterprise.

Francis Hurla, who was driving the Hurla car, testified that the county road near the intersection was being repaired and was rough; that a ridge of dirt two feet high was in the middle of the road; that when he was about 70 yards from the intersection he noticed a car coming from the south on the township road; the road running south was "quite up-grade"; that he first noticed the flash of the sun on the windshield of the Ford "on top of the hill"; that it was then about 200 yards south of the intersection; that as the car approached from the south it seemed to increase its speed. He further testified:·

"Q. You say as you were approaching the intersection you noticed the Lane car coming down the hill to the north? A. Yes.

"Q. And you knew he was running about fifty miles? A. The first time I saw the car.

"Q. He thereafter increased his speed? A. It seemed to me before I entered the intersection and slacked up, looked like it slacked just a little.

"Q. At what rate was he traveling, in your judgment, when he increased his speed? A. I could not tell; when I entered the intersection I noticed the car was gaining speed.

"Q. Would you venture your judgment as to how fast it was going? A. I would say about fifty miles an hour after I had reached the intersection. After I got in the intersection I noticed the car increased speed."

The witness testified that he was traveling about 20 miles an hour when he entered the intersection; that he was three-fourths of the

way across when he saw there was going to be a collision, and then put on his brakes.

The testimony of Louis Hurla, the father, who was riding in the back seat, was in substance the same as that given by Francis, the driver.

Michael Hurla, the plaintiff, was riding on the front seat with the driver; he did not see the Zirkle car until the Hurla car entered the intersection. There was nothing to prevent him from seeing what his brother and father saw if he had been looking. He said nothing to his brother, who was driving, "because I knew he saw the car."

There was testimony that immediately after the collision the defendant Zirkle stated: "I did not see you until the last minute. I knew my brakes would not hold me and I stepped on the gas. Thought I could beat you across."

The following statutes were in force at the time of the accident:

"The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway." (G. S. 1937 Supp. 8-550, a.)

"The driver of a vehicle shall stop as required by this act at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard." (G. S. 1937 Supp. 8-552, a.)

In testing the sufficiency of the evidence as against a demurrer, we are to consider all of the plaintiff's evidence as true; we are to consider that favorable to the plaintiff and disregard that which is unfavorable; we are to make all inferences favorable to the plaintiff, and not weigh any part that is contradictory. (*Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903.) Guided by these rules upon a fair survey of the record, and outline of which is sketched above, we think the trial court was in error in sustaining the demurrer of the defendants Lane and Zirkle to the plaintiff's evidence. From the testimony, it is clear that the Ford car driven by Zirkle approaching the county highway on the township road did not stop, but entered the intersection at a high rate of speed after the car in which plaintiff was riding was in the intersection. These traffic regulations are the outgrowth of necessity, and the safety of the users of our highways depends upon their observance. Failure to obey the regulations not only endangers the safety of the persons guilty of disobedience, but also endangers the safety of others using the highways in a lawful manner. It has been held that an act done in violation of positive

law is itself negligence. (*Fairchild v. Dean* [Wash.], 86 P. 2d. 271.)

We do not find that the persons riding in the Hurla car were engaged in a joint enterprise as that term has been construed by this court. (*Link v. Miller*, 133 Kan. 469, 300 Pac. 1105; *Farmer v. Central Mut. Ins. Co.*, 145 Kan. 951, 67 P. 2d 511.) Neither can we say from the testimony adduced that the plaintiff was guilty of contributory negligence as a matter of law.

Did the court err in sustaining the demurrers of plaintiff to the evidence of Arthur Capper and Capper Publications, Incorporated?

The defendant Arthur Capper, in his separate answer, denied that he at any time, either in his personal capacity or as owner of the Topeka Daily *Capital*, operated any newspaper route or routes in the neighborhood of Delia; denied that John Lane, Orland Lane, Dewayne Zirkle or Leo Hanrahan were his agents, servants or employees as alleged in plaintiff's petition. The answer further alleged that the defendant John Lane was the owner of and was operating a newspaper route on his own responsibility for the purpose of delivering the Sunday edition of the Topeka Daily *Capital;* the answer alleges that neither he nor any members of the organization of that paper exercised any supervision, control, management or direction of any kind over John Lane or any of the other defendants in the case in connection with the handling of the paper route or the delivery of the papers.

The evidence which appellant claims establishes the relation of master and servant between the defendant Capper and the defendant John Lane is thus summarized in appellants' brief:

"The evidence disclosed that sometime in 1936 the Hurla family and the Ready family were solicited by an individual or individuals to subscribe to the Topeka Daily *Capital*. Francis Hurla subscribed for two weeks, paid his subscription to a Robert Smith, and was informed by Mr. Smith that John Lane would deliver the paper every Sunday morning in their mailbox, and on week days it would be delivered by the mail carrier, and that if he desired to take the paper after the expiration of the two weeks, that he should see John Lane. Mr. Smith gave Francis a subscription card which he testified was similar to plaintiff's exhibit 'L'. The paper was delivered to the mailbox by the mail carrier on week mornings, and on Sunday morning by the defendant John Lane. After the expiration of the two weeks he continued to take the paper, paid the subscription to John Lane, and received from him subscription card.

"The Ready family had been taking the Topeka Daily *Capital* for some time, and had their subscription paid in advance. That a man representing the Topeka Daily *Capital* called at their farm sometime in 1936, with John

Lane, and solicited their subscription for the Sunday *Capital*. Some adjustment was made as to the advance subscription and the Sunday *Capital* was delivered in the Ready mailbox by John Lane and subscription card delivered to them by John Lane. That on one occasion, about the first of February, 1938, a man from the Topeka Daily *Capital* called on Mr. Ready and asked him if he was satisfied with the paper. He informed the representative that they were not, because the paper was not being delivered on Sunday morning as agreed, and that the following Sunday morning the paper was delivered between six and seven o'clock, and since that time has been delivered every Sunday morning by John Lane.

"The evidence further discloses that on various occasions John Lane had with him another person when collecting on the paper route, whom he introduced to the subscribers as his boss, stating: 'We are hunting you fellows up that are behind with your subscriptions,' and at these times payment was made on subscriptions.

"The defendants, Arthur Capper and Capper Publications, Incorporated, in their answers alleged that at the time of the collision the Lane automobile was being driven by the agents, servants and employees of the defendant John Lane."

As stated above, John Lane in his answer specifically denied that he was agent, servant or employee of Arthur Capper or Capper Publications, Incorporated.

Appellant argues that as against the demurrer the facts and circumstances disclosed by the evidence above detailed are sufficient to establish the relation of principal and agent between Lane and the defendants Arthur Capper and Capper Publications. In support of this contention appellant quotes from *Stout v. Bolin,* 101 Kan. 594, 596, 168 Pac. 676, as follows: "It is elementary that agency may be proved by facts, circumstances, admissions, and other indirect evidence. . . ." Also, from *Wilson v. Haun,* 97 Kan. 445, 155 Pac. 798, where this court stated: "To establish the relation of agency an express appointment and acceptance thereof is not essential, but it may be implied from other facts, such as the statements of the parties, their conduct and the relevant circumstances." Appellant also cites and relies upon *Richmond v. Clinton,* 144 Kan. 328, 58 P. 2d 1116, where, under the facts therein detailed, the driver of a cab was held to be the agent of the cab company, notwithstanding the taxicab was not owned by the cab company. *Hilton v. Sheridan Coal Co.,* 132 Kan. 525, 297 Pac. 413, is quoted: "The authority of a superintendent of coal mines to speak and act for his employer may be sufficiently established by facts and circumstances, notwithstanding a want of direct evidence of his appointment and a verified denial of such authority."

Appellant asserts that "the evidence under the authorities cited clearly establishes a prima facie case of principal and agent between Lane and the defendants Arthur Capper and Capper Publications." In other words, the theory of appellant appears to be that if an agency is established, liability is established. In this view we cannot concur. Conceding for the moment that the meager testimony adduced is sufficient to establish a prima facie case of principal and agent, it does not follow that defendants are liable in this action. It is necessary to establish that particular species of agency known in the law as master and servant. It is necessary to show by competent testimony that the defendants Arthur Capper and the Capper Publications controlled or had a right to control the physical conduct of Lane in the performance of the service required by the employment. We quote from the Restatement of Agency, section 2, and comment *b* thereunder:

"(1) A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.

"*Comment b.* The word 'servant' is used in contrast with 'independent contractor,' a term which includes all persons who contract to do something for another and who are not servants with respect thereto. An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal. Thus, a broker who contracts to sell goods for his principal is an independent contractor as distinguished from a servant. Although, under some conditions, the principal is bound by the broker's unauthorized contracts and representations, the principal is not liable to third persons for tangible harm resulting from his unauthorized physical conduct within the scope of the employment, as the principal would be for similar conduct by a servant; nor does the principal have the duties or immunities of a master towards the broker. While an agent who contracts to act and who is not a servant is therefore an independent contractor, not all independent contractors are agents. Thus, one who contracts for a stipulated price to build a house for another who reserves no direction over the conduct of the work is an independent contractor; but he is not an agent since his is not a fiduciary, has no power to make the one employing him a party to a transaction, and is subject to no control as to his conduct.

"The word 'servant' is thus used to distinguish a group of persons for whose physical conduct the master is responsible to third persons. . . ."

While a master is a species of principal, and a servant is a species of agent, it is not every principal who is liable for the tortious conduct of an agent. We quote from the Restatement of Agency, section 250, and comment *a* thereunder:

"Except as stated in § 251, a principal is not liable for physical harm caused by the negligent physical conduct of an agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner directed or authorized by the principal or the result was one intended or authorized by the principal.

"*Comment: a.* A principal employing another to achieve a result but not controlling nor having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. Thus, the principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such. In their movements and their control of physical forces, they are in the relation of independent contractors to the principal. It is only when to the relationship of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relationship of master and servant, that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor. . . ."

Thus in the case of *Dohner v. Grocery Co.*, 116 Kan. 237, 226 Pac. 767, a traveling salesman was employed to cover certain territory once a week to sell goods of his employer. He was required to take orders for goods and to collect for goods that had been delivered. No requirement was made as to the manner in which he was to cover the territory, and he was to pay his own transportation expenses. The salesman used his own car. He was paid a salary of $175 per month. He had an accident on the highway while on a trip over his territory which injured a person, who sued his employer, the grocery company. As stated in the syllabus, this court said:

"A salesman who operates an automobile at his own expense, whose movements are not controlled by his employer, except that he shall make his territory once each week, is, with respect to the operation of the car, an independent contractor so that his employer is not answerable for injuries caused by his negligent operation of the car."

While the salesman was the agent of the grocery company for the purpose of taking orders and collecting money for goods delivered, he was not a servant subject to the direction of the grocery company in the physical operation of the automobile on the highways. He was not controlled or subject to the right of control by the company with respect to his physical conduct in the performance of the undertaking. The Dohner case was cited with approval in *McCraner v.*

*Nunn,* 129 Kan. 802, 284 Pac. 603, where a similar question was before this court.

In *Gall v. Detroit Journal Co.,* 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164, an employee, Rebtoy, of the defendant company, while driving an automobile in the work of delivering newspapers for the company, ran against a party, causing injuries. The court said:

"Rebtoy was to deliver the papers to such persons, at such places, and on such time as the company should from day to day designate. Such delivery was the result to be obtained. And Rebtoy was to effect such delivery and obtain such result by any means and by any conveyance and in any way he saw fit. He could make the deliveries in person, or through others employed by him. It is shown by the evidence that those making deliveries for the company did occasionally employ others to do the work. He could use a horse, an automobile, or carry the papers on foot, provided he got them to the right persons, at the right places, and upon time. So far as the terms of the contract are concerned Rebtoy was certainly an independent contractor and not a servant. One whom the employer does not control, and has no right to control, as to the method, or means, by which he produces the result contracted for is an independent contractor. . . . Rebtoy did have a contract for a specific piece of work; that is, for the delivery of the papers. And it was none the less specific because the places to which the deliveries were to be made, and the persons to whom the papers were to be delivered, might change from day to day. The right, on the part of the company, to designate the persons and places was but a right to designate the result to be obtained, and did not give the company any control over the method for obtaining that result. . . ." (p. 409.)

In *Bohanon v. James McClatchy Pub. Co.,* 16 Cal. App. 2d 188, 60 P. 2d 510, the driver of a car delivering newspapers caused the injuries complained of in the action. Paragraph 3 of the headnote of that case in 60 P. 2d 510 reads as follows:

"Automobile route carrier's contract with newspaper publishing company, which required carrier to provide his own equipment, to deliver papers at earliest moment satisfactory to company and subscribers, to make collections monthly, and to attempt to increase circulation, and which reserved in company right to discharge carrier if his work was unsatisfactory, *held* to create relationship of 'independent contractor' and not 'employee,' and hence publishing company was not liable for injury to motorist caused by negligence of carrier's employee in operation of automobile while engaged in delivering newspapers."

See, also, *Skidmore v. Haggard,* 341 Mo. 837, 110 S. W. 2d 726; *Wesolowskie et al. v. Hancock Ins. Co.,* 308 Pa. St. 117, 162 Atl. 166, 87 A. L. R. 783; *American Nat. Ins. Co. v. Denke,* (Tex. Com. App.) 95 S. W. 2d 370, 107 A. L. R. 409.

In *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498, an independent contractor was defined:

"The general rule is that when a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the contractor.

"When a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor." (*Pottorff v. Mining Co.*, 86 Kan. 774, syl. ¶ 1, 122 Pac. 120.)

Under the established rule in this state it is necessary to show by competent testimony that the relation of master and servant existed between John Lane and Arthur Capper. It is not sufficient to show that John Lane had a paper route, and that he solicited and collected subscriptions and delivered papers to the subscribers. These acts are consistent with the conduct of an independent contractor. Giving the plaintiff the benefit of every reasonable inference arising from the evidence adduced, it fails to show that Arthur Capper controlled or had the right to control the physical conduct of John Lane in the performance of his duties as a paper carrier over the route. A fact is not proved by circumstances which are merely consistent with its existence. (*Redfield v. Chelsea Coal Co.*, 143 Kan. 480, 482, 54 P. 2d 975.) A finding of negligence cannot rest on mere conjecture but must be established by competent proof. (*Hendren v. Snyder*, 143 Kan. 34, 53 P. 2d 472.) It is admitted that Lane owned the car. In the absence of testimony to the contrary this would raise an inference that Lane, not Capper, controlled and had a right to control the operation of the car. This circumstance was held to be an important factor in *Dohner v. Grocery Co.*, supra.

On the subscription card delivered by Lane to the subscriber appeared the title "Topeka Daily *Capital*," "Topeka Sunday *Capital*" and was endorsed "Carrier, J. A. Lane." It is argued that this establishes the relation of master and servant between the parties. We think, however, this is consistent with the view that Lane was an independent contractor. In *Brownrigg v. Allvine Dairy Co.*, 137 Kan. 209, 19 P. 2d 474, it was held:

"Where a dairy company sells milk at wholesale to persons owning their own trucks on which they are permitted to paint the name of the dairy company, its telephone number and its milk permit number, and the dairy com-

pany retains no control over such persons, does not direct them where to take the milk and fixes no route or district, but such persons are free to go where they will and to sell the milk to whom they please, the relation between the dairy company and the truck driver is that of contractor and contractee and not that of master and servant, and in the event of injury caused by the negligence of the truck driver in the operation of its truck, the dairy company is not liable."

There is no evidence that the defendant Arthur Capper had any contractual relations of any kind with Dewayne Zirkle, the driver of the Ford car.

All that has been said as regards the defendant Arthur Capper applies to the defendant Capper Publications, Incorporated. The demurrer was properly sustained as to these defendants.

The judgment of the trial court is reversed as to the defendants John Lane and Dewayne Zirkle. The judgment is affirmed as to the defendants Arthur Capper and Capper Publications, Incorporated.

HARVEY, J. (concurring in part) : I agree that in consideration of defendants' demurrer to plaintiff's evidence the court should consider the evidence offered by plaintiff as favorably to him as that reasonably can be done. I agree that the evidence offered by plaintiff in this case was sufficient to go to the jury as against the defendants, John Lane and Zirkle. Plaintiff had alleged that John Lane was the agent, servant and employee of Arthur Capper. The burden was upon plaintiff to prove that Lane was such a servant, or such an employee of· Capper as to make Capper liable for the negligence of Lane in delivering the Sunday *Capital*. The evidence was far short of that. The most the evidence established along this line was that under some arrangement with Capper, or with some other undisclosed person, Lane was delivering a newspaper published by Capper and collecting subscriptions thereon. Clearly, this is not enough to show that Capper was liable for injuries resulting from Lane's negligence while delivering such papers.

I see no reason in this case for discussing the doctrine of independent contractor. It is true, the answers of some of the defendants alleged that Lane was an independent contractor, but no evidence was offered in support of those allegations. They did not enter into the decision of the trial court when ruling upon the demurrers to plaintiff's evidence.

WEDELL and HOCH, JJ., concur fully in the views expressed by Mr. Justice Harvey.