No. 33,979

ARTIE DOBSON, *Appellee*, v. THE BAXTER CHAT COMPANY and VERNON WHITE, *Appellants* (JAMES WHITE, *Defendant*).

(85 P. 2d 1)

Opinion filed December 10, 1938.

*P. E. Nulton, R. L. Letton,* both of Pittsburg, *Al F. Williams, Don H. Elleman,* both of Columbus, *A. C. Wallace* and *John R. Wallace,* both of Miami, Okla., for the appellants.

*C. E. Rumery,* of Baxter Springs, *E. B. Morgan* and *Dale W. Maxwell,* both of Galena, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for damages for injuries alleged to have been sustained when the car in which plaintiff was riding collided with a truck. Judgment was for plaintiff. Defendant appeals.

The action was against the Baxter Chat Company and Vernon White and James White, his brother. The Chat Company was engaged in operating a tailing mill. In operating this mill it had chats,

tailings and sand hauled from a point about one and one-half miles south of Baxter Springs to its tailing mill west of that city. This material was hauled in trucks. The route traveled by these trucks from the place where they were loaded was north on Military avenue to Twelfth street, thence west on Twelfth street to the tailing mill. Plaintiff was injured when the car in which she was riding was struck at the intersection of Twelfth and Wyandotte by a Chevrolet truck loaded with chats. The truck was owned by James White. At the time of the collision it was being driven by Vernon White. The action was brought against the Chat Company and both the Whites on the theory that they were the employees of the company. The Chat Company argues that its demurrer to the evidence of plaintiff should have been sustained because it did not show that Vernon White was the servant of the company. This point was also raised in a motion for a directed verdict and for judgment notwithstanding the verdict. On account of the vigor with which this point is urged we shall deal with it at the outset.

James White testified for the plaintiff that the work in question was that of hauling tailings from where they had been thrown around a mine to a mill where the tailings were treated so as to get more ore out; that he was not the only one hauling; that they hauled what the mill would handle each day; that the tailings were loaded on the dump trucks with a power shovel operated by a man named Charley; that the Chat Company paid him for hauling; that along about the 4th or 5th of January he asked Sam Smith at the place where the chats were being loaded if he could have a job, and Sam said he was full up at the time but would give him the first opening, and that the company paid seven cents a ton for the hauling; that about the 5th of January he drove nis truck to the place where the chats were being loaded, and the shovel man told him to "back under and load up," and he did back under and load up and took the load of tailings by the road which the rest of the trucks were taking to the mill west of Baxter Springs and dumped it in the hopper; that a scale man at the chat mill weighed two or three of the loads each day; that he worked for seven or eight hours that day; that he hauled on the 6th of January, and when he came to work on the 7th he brought his brother with him, and went with him on two of the loads to show him where the mill was; that he was paid once a week by check; got his pay from the shovel operator, and the check had the Baxter Chat Company at the heading; that he continued hauling

for about five weeks; that the reason he had Vernon White drive the truck on the day in question was that he had rheumatism on that day; that on that day Vernon was taking his place in the operation of the truck; that he had no record of the weight of the various loads, and relied on the figures of the Chat Company; that he had no agreement with the Chat Company as to how many loads he would haul; that the way he knew he could not haul any more on a particular day was if the hopper was full along in the afternoon they knew they could not haul any more and went home; that when he came to the place where the chats were being loaded he drove his truck to a place where the shovel could reach it.

On cross-examination he testified that he did not receive any compensation from the Chat Company over seven cents a ton; that he paid for his own gas and oil and upkeep of the truck; that no employee of the Chat Company told him what route to take, nor how to load, nor as to the number of trips he was to make a day, nor the time he should take in making the trips; that he hired Vernon White to drive the truck on January 7; that no one connected with the company suggested that he hire Vernon; that Vernon White remained subject to his control and direction at all times.

On redirect examination he testified that the only agent or supervisor of the company he knew was Sam Smith; that while Vernon White was driving the truck he would have heeded the directions of the shovel operator had any been given.

The next witness was Charley Anderson, the shovel operator. He testified that he was employed to run the shovel; that all the truck drivers knew they were to go to work at eight o'clock in the morning; that if a truck driver came along and they needed a truck he was told to go to work under orders of Sam Smith, the foreman; that when something happened at the mill on account of which they did not need any more chats they sent word down from the mill and he or the foreman told the truck drivers; that the truck drivers quit working for the company whenever they got ready.

Sam Smith testified that he was superintendent of the Chat Company and had charge of hauling the chat; that he hired the truck drivers; that some arrangement was made with all truck drivers; that if a truck driver wanted to quit they had no means of preventing him; he would decide whether a truck driver was needed; he determined how long the company would keep a man and who would be employed.

Recalled, the shovel man testified that he knew Vernon White was driving one of the trucks on the day plaintiff was injured.

To this evidence the Chat Company interposed a demurrer and moved the court for a directed verdict in its favor. The demurrer was overruled and the motion denied. The Chat Company urges this was error.

The first argument of the company is that it is entitled to judgment because the evidence of plaintiff failed to establish that Vernon White was driving the truck in question as the servant of the company. The argument is that Vernon White was the employee of James White and James White was not the employee of the Chat Company, but was an independent contractor. The company contends that the decisions of this court in *Redfield v. Chelsea Coal Co.*, 136 Kan. 588, 16 P. 2d 475, also *Redfield v. Chelsea Coal Co.*, 138 Kan. 373, 26 P. 2d 579, are controlling on this point. Those were two cases that involved the same parties and the same collision. We have examined them and have concluded that there is such a difference in the facts between this case and those two that they cannot be given the weight for which the defendant contends. Those two cases were disposed of on a demurrer to the evidence. The plaintiff in the Redfield case was injured when the car in which she was riding collided with a truck driven by a man named Lamb and owned by a man named Garland. The truck had been used in hauling coal for the mining company. The plaintiff did not call the officers of the mining company to the stand so that there could be the clear proof of the relationship between the truck owner and the company, and the truck driver and the company, that there was in this case. In one of these opinions it was remarked that there was no proof that the truck was being used to haul coal or even returning from hauling coal at the time of the collision. The situation was quite different in this case. Neither do we have any quarrel with the rule laid down in *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498, nor that laid down in *Brownrigg v. Allvine Dairy Co.*, 137 Kan. 209, 19 P. 2d 474.

This court when considering a demurrer to the evidence will consider all the plaintiff's evidence as true, will consider that favorable to plaintiff and disregard that unfavorable to plaintiff. (See *Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903.)

In *Pottorff v. Mining Co.*, 86 Kan. 774, 122 Pac. 120, this court defined the term "independent contractor" as follows:

"An independent contractor generally is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to the result of his work." (Syl. ¶ 2.)

It will be noted that the distinction turns not on whether the employer exercises the right of control, but on whether the employee is subject to the control of the employer. It should also be noted that the term "independent contractor" implies that it is one who contracts to do a certain *piece of work*. This question was further considered in *Maughlelle v. Mining Co.*, 99 Kan. 412, 161 Pac. 907. There this court said:

". . . according to all the authorities whether they were or not depends upon who had the right of control over the work. This was made plain in *Pottorff v. Mining Company*, 86 Kan. 774, 122 Pac. 120, approving the definition of the term 'independent contractor' as 'one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work,' and it was said that 'an independent contractor represents the will of his employer only in the result of his work and not in the means by which it is accomplished,' and 'the proprietor may make himself liable by retaining the right to direct and control the time and manner of executing the work.'" (p. 415.)

In this case an examination of the record convinces us that the Chat Company at all times had the right to control the manner in which this work was done. Sam Smith, the foreman, testified to that effect. The fact that the occasion did not arise for the exercise of that control on this particular job does not mean that the right to control was not there.

Then there is the element of contracting to do a certain *piece* of work. James White did not contract to haul any certain number of loads nor did the company agree to pay him for hauling any certain number of loads. He could have quit after the first load had he wished to or the company could have discharged him after the first load. To the same effect is *Cockran v. Rice*, 26 S. D. 393, 128 N. W. 583. There the unrestricted right of the employer to end the employment was emphasized. (See, also, *McKinstry v. Coal Co.*, 116 Kan. 192, 225 Pac. 743; *Phillips v. Armour & Co.*, 108 Kan. 596, 196 Pac. 245.) We have concluded that the evidence in this respect established that James White was the employee of the Baxter Chat Company.

We next come to the relationship between the Chat Company and Vernon White. It will be noted that the next day after James was

employed he put Vernon in charge of the truck. It will also be noted that the shovel operator for the company knew that Vernon was driving the truck on the morning in question. The rule is stated in 39 C. J. 1271 as follows:

"Subject to the limitation that the acts complained of must be within the scope of the servant's employment, a master is liable for the acts of one whom the servant employs under authority given him by the master to assist in the performance of the master's work. The authority to employ assistants may be either express or implied; it may be implied from the nature of the work to be performed, from the general course of conducting the business of the master by the servant, or from the circumstances of the particular case.

"Authority to hire other servants to do the work of the master may be implied when he knows of such hiring and acquiesces in it.

"A master may also become liable for the acts of an assistant employed by the servant where he ratifies such employment.

"If the employment was authorized, the employing servant is not liable for the acts of the servant so employed."

In this case it is clear that the Chat Company had control over Vernon White at all times when he was working, just as it had over James White. The work performed by Vernon was just the same work as was performed by James. In *Haluptzok v. Great Northern Ry. Co.*, 55 Minn. 446, 26 L. R. A. 739, the court held:

"If a servant who is employed to perform certain work for his master procures another person to assist him, the master is liable for the negligence of the latter only when the servant had authority to employ such assistant.

"But this authority may be implied from the nature of the work to be performed, or from the general course of conducting the business of the master by the servant; and it is not necessary that there should be an express employment of the person in behalf of the master, or that compensation be paid or expected. It is enough to render the master liable if the person guilty of the negligence was at the time in fact rendering service for him by his consent, express or implied."

In that case the plaintiff was injured by a person whom an employee at the depot had asked to assist him. The court held the company liable for the acts of the helper. In *Southern Express Co. v. Brown*, 67 Miss. 260, 19 A. S. R. 306, the court held the company liable for the acts of a person whom its agent had employed to help him in doing the company's work. The decision turned on the fact that the third person was really doing work for the company and was subject to being discharged by the company, just as Vernon White was in this case. The court quoted with approval from *Kimball v. Cushman*, 103 Mass. 194, 4 Atl. 528. There the court said:

"The fact that a person, who, being in charge of a horse with the assent of

its owner and engaged on his business caused an injury by negligent riding, was in the general employment of a third person, does not exempt the owner of the horse from liability for the injury, unless the relation of the third person to the business was such as to give him exclusive control of the means and manner of its accomplishment, and exclusive direction of the persons employed therefor." (Syl.)

See, also, *Hollidge v. Duncan*, 199 Mass. 121, 85 N. E. 186. These authorities are controlling in this case, in view of the fact that the shovel man for the company who told James White to go to work knew that Vernon White was driving the truck on the morning in question. Apparently it made no difference to the company who was operating the truck, just so it was operated. We have concluded that James White and Vernon White were both servants of the Chat Company and the company was liable for their negligence.

The defendants, the Chat Company and Vernon White, next argue that they are entitled to judgment because the evidence shows that the collision was caused by the negligence of plaintiff and of the driver of her car. In deciding this question we shall note the manner in which the collision occurred.

The plaintiff alleged that the car in which she was riding was being driven southward upon Wyandotte street toward the intersection of that street with Twelfth street; that the driver of her car brought it to a complete stop before entering the intersection, saw no vehicles approaching, entered the intersection and was commencing to make a turn to the east when the defendants' agent and employee driving a truck at a high and dangerous rate of speed and on the wrong side of the street, drove the truck into the car in which plaintiff was riding and injured her.

Mary Bynum was the driver. She testified that she stopped just before entering the intersection and looked in both directions; saw no vehicles approaching, drove into the intersection and got about a car's length on Twelfth street and saw the truck coming at the railroad tracks, which other witnesses placed about 200 or 250 feet east of the intersection; that after passing the center of Twelfth street about half or three quarters of a car's length she started to turn east, had turned about half or three-fourths of a car's length at the time the truck hit her. If this story were believed by the jury it would be sufficient to warrant it in finding that the defendant was guilty of negligence for being on the wrong side of the street. There is nothing in that story to justify a finding that the plaintiff or her driver was guilty of contributory negligence. The testimony

of plaintiff corroborated that of her driver. We hold that there was sufficient evidence as to the negligence of the truck driver to make that a question for the jury, as was also the matter of contributory negligence of plaintiff and her driver. This was not a case where the car of plaintiff was driven into the path of an on-coming truck. The car of plaintiff had reached a place of safety, that is, the right-hand side of the street, where it would not have been hit had the truck been on the right-hand side of the street, where it belonged. There is evidence in the record contradictory to this, but this court cannot weigh evidence on a question of a demurrer to the evidence.

Defendants next argue that they should be given a new trial on account of newly discovered evidence. At the hearing of the motion for a new trial the defendants furnished an affidavit of one eyewitness to the collision, that immediately after the collision he heard plaintiff say that Mary Bynum did not stop before entering the intersection and that she admitted she did not see the truck until they were out in the intersection. They furnished the affidavit of another eyewitness that he saw the car of plaintiff enter the intersection without stopping, at a speed of about fifteen miles an hour, and of another witness who stated that the White truck, after the collision, was standing with its north wheels north of the center line of Twelfth street and that there were skid marks where the Dobson car had been pushed east down the center of the street.

The trial court considered these affidavits along with the oral testimony of one of the affiants, which did not agree altogether with his affidavit. The court had also heard the testimony of the witnesses at the trial. It was the trial court's duty to find whether this evidence could have been discovered with due diligence before the trial, whether it was cumulative and whether it was of such a character and strength as would with reasonable probability have compelled a different decision. (See *Sexton v. Lamb,* 27 Kan. 432.) On the question of whether the evidence was cumulative there can be no doubt. There was some evidence at the trial on every point upon which evidence was offered on the motion for a new trial. As to whether the evidence was of such a character and strength as would with reasonable probability have compelled a different decision, this is a matter upon which the trial court should exercise its discretion. No doubt the court did so in this case. We cannot say here that the decision reached by the trial court was an abuse of discretion or that the affidavits offered compelled any other decision.

Defendants next argue that the court erred in refusing to give certain instructions and in giving other instructions over the objection of the defendants. We have examined these instructions and find them to be without error.

Defendants next argue that they were entitled to a new trial because the verdict was grossly excessive. The verdict was for $12,000. Plaintiff argues that defendant Chat Company cannot raise that question here. A consideration of this argument requires an examination of certain events that happened at the trial. It will be noted that the action was against James White and Vernon White and the Baxter Chat Company. At the close of the evidence of plaintiff all these parties demurred to it. These demurrers were overruled. The Chat Company then elected to stand on its demurrer. It was stipulated that in the event of a verdict against Vernon White or James White or against either or both of them that a judgment should be by the court entered against the Baxter Chat Company for such an amount of damages as should be assessed against either one or both of the Whites. At the close of the entire case a motion for a directed verdict as to James White was confessed because it appeared that Vernon was the employee of the company and not of James. Final judgment was then entered against the Chat Company and Vernon. Defendants point to the above agreement and argue that since the Chat Company agreed that whatever judgment should be entered against either one of the Whites should be entered against it, they cannot now be heard to protest the size of the verdict. We do not think, however, that by this stipulation the Chat Company waived its rights to have any ruling of the trial court reviewed. Furthermore, Vernon White is also an appellant here, and certainly he has a right to raise the point of the excessiveness of the verdict.

The plaintiff did not suffer the fracture of any bones or the displacement of any bony structure, no vital organ was injured and there were no lacerations of her face or any other parts of her body. She was not rendered unconscious. According to her own testimony she was bruised all over her right side, including her breast. She was black and blue all over her body. At the time of the trial there was a knot in her right breast that had been there ever since the wreck. It was sore to the touch. Her hip was bruised so badly that she could not sit down comfortably. There was a very sore place at the end of her spine. The next day after the injury she

commenced flowing and flowed constantly for five or six weeks. At the time of the trial she still had the same trouble. She went to a doctor, but continued to flow, and got so she could not get on her feet. She had not had any trouble with her menses previously. She got so she could not even sweep her house, was restless at night and had headaches almost constantly. Before the accident she was taking care of the children and doing from seven to twelve washings a week. After the wreck she had to give them up and had to hire help to do her housework. Her doctor corroborated this testimony in the main. He testified that the trouble with her menstrual flowing was due to her uterus being prolapsed. This was corrected in a measure by her wearing a ring to support the uterus. He testified that the soreness at the base of her spine was caused by her coccyx having been cracked. He stated that the lump in her right breast was about the size of a pecan, and had grown some since the injury. He did not know whether this lump was a malignant growth or not. He testified that the flowing condition could be cured by a major operation that would cost, including the hospital bill, about $250 or $300. From the above statement it will be seen that plaintiff did not receive any injury that cannot be corrected at a moderate cost.

While there is no hard-and-fast rule by which the amount of a verdict may be measured as to whether or not it is excessive, it is plain that the amount of the verdict in this case is a great deal more than enough to compensate the plaintiff for damages she may have suffered. It is not every excessive verdict, however, that requires a new trial. In some cases the error can be cured by reducing the amount of the judgment. In cases where the amount has been so out of proportion to the damages suffered as to shock the conscience of this court, approval of a judgment in the amount granted by the trial court has been withheld and the order has been that the judgment would be affirmed provided that the plaintiff would accept a judgment in a sum somewhat less than the amount for which the verdict was rendered.

We have concluded that such an order should be made in this case in the interest of justice.

If plaintiff will remit $5,000 of the judgment, and so advises the clerk of this court within ten days after the filing of this opinion, the judgment of the court will be affirmed; otherwise, it will be reversed for a new trial. It is so ordered.