No. 34,961

CHARLES HOUDEK, *Appellee* and *Cross-appellant*, v. GLENN GLOYD, *Appellant* (THE OEHLERT TRACTOR & EQUIPMENT COMPANY, *Appellee*).

No. 34,962

CHARLES HOUDEK, Administrator of the Estate of Emilie Houdek, Deceased, *Appellee* and *Cross-appellant*, v. GLENN GLOYD, *Appellant* (THE OEHLERT TRACTOR & EQUIPMENT COMPANY, *Appellee*).

(107 P. 2d 751)

Opinion filed December 7, 1940.

*W. S. Norris, Wint Smith, Homer B. Jenkins,* all of Salina, *Samuel E. Bartlett* and *R. Brewster Bartlett,* both of Ellsworth, for appellee and cross-appellant.

*C. W. Burch, B. I. Litowich, LaRue Royce, L. E: Clevenger, E. S. Hampton* and *R. E. Haggart,* all of Salina, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This appeal involves liability for injuries sustained in an automobile accident in which Charles Houdek sustained personal injuries and in which his wife was killed. Houdek filed one action to recover personally and, as administrator, another action to recover for the wrongful death of his wife. Both actions were against Glenn Gloyd, the driver of a car causing the accident and against his alleged employer, The Oehlert Tractor & Equipment Company, hereafter referred to as the company. The causes were consolidated for trial in the district court.

During the trial, the company demurred to plaintiff's evidence for the reason it did not prove the relation of master and servant existed between Gloyd and the company, the demurrer being overruled. At the close of all the evidence, the company moved the court for judgment for the same reason, the motion being denied. Under instructions, of which no complaint is made, the jury returned verdicts in each case against both defendants and answered special questions submitted to it. Gloyd's motions to set aside certain of those answers and·for a new trial were denied, and he perfected an appeal, which has been abandoned. The company filed similar motions and for judgment notwithstanding the verdict. On these motions, the trial court set aside certain answers and rendered judgment notwithstanding the verdict in favor of the company, which was permitted to withdraw its motion for a new trial. From these rulings the plaintiff appealed, the gist of the specifications of error being that the trial court erred in holding as a matter of law that the relation of master and servant between the company and Gloyd had not been established by the evidence.

There is no longer any question as to the liability of Gloyd. For purposes of discussion we review briefly the evidence of all parties, but for the sake of clarity we shall not follow the order in which it was presented at the trial, nor shall we allude to much of the details shown.

The company had been engaged in business for some years at

Salina, in handling seventeen lines of heavy road-building equipment, and in connection therewith it often took used equipment as a part of the purchase price, and in the fall of 1937 it had a considerable amount of used equipment on hand. For a time in 1929 and 1930 Gloyd had been an employee of the company. Thereafter he was employed otherwise, until in the fall of 1937 when he sought to make some arrangement with the company to sell used machinery, when he was informed that company had regular salesmen, but that it had used machinery on hand at prices listed; that Gloyd was given such a list and informed that he could sell any of such used machinery, paying to the company eighty-five percent of the listed price. If the used machinery were sold on deferred payments, the terms of the contract were to be approved by the company and evidenced by forms of contract which it furnished. If any used machinery were to be taken in on any trade, the company was to fix a price at which it would accept the same. Subject to the above, the company was not concerned with the price at which Gloyd sold the used machinery. He was to receive for his services any amount he could get over and above the eighty-five percent of the listed price. The arrangement was oral; there was no written contract. The company had regular salesmen who had specified territories, who were paid salaries and commissions, and who were furnished automobiles to use in their employment. There was no agreement with Gloyd to pay him any salary or expenses or to furnish him a car, nor was he directed where to go in making his sales, the only understanding being he was not to interfere with any sales the regular salesmen were working on. In order for Gloyd to sell any machinery, it was necessary that he use an automobile, and he furnished his own. Gloyd was not required to and made no reports to the company as to where he went or whom he saw, further than on occasions he seems to have inquired if it would be all right to approach possible customers. Such sales as he made were reported to the company, and if used machinery was to be taken in by the company, it was first appraised, and the company approved contracts for deferred payments. In a period from about November 1, 1937, to January 31, 1938, Gloyd secured at least ten purchasers with whom purchase or lease contracts were completed. He also made one or two cash sales. There was one other payment made to Gloyd. About December 1, 1937, he asked Oehlert, the manager, if the company had completed a certain deal with Rus-

sell county, and was told it had not. Gloyd said he could help with the county commissioners, and that he would get the order for $100, and if he didn't get the order, the company wouldn't owe him anything. Oehlert told him to get busy, the order was procured and Gloyd was paid $100 on December 9. There was evidence that when sales were made by regular salesmen, terms had to be approved by officers of the company. Officers of the company testified they had no written contract with Gloyd and could have terminated their arrangement with him at any time; that Gloyd had no interest in the company or the equipment it owned, and that the company could have terminated the arrangement even though it then had a "whole yard full of used equipment." The vice-president and general manager of the company produced a record showing the company had paid social security tax to the federal government, and in the list of employees Gloyd's name was included; that the Internal Revenue Department had not told the company it must pay tax on a person selling on commissions, and "We couldn't find it anywhere we didn't have to pay them. And it was cheaper to pay them than have an attorney tell us."

On January 31, 1938, Gloyd, without any directions from the company, went to Ellsworth county in an effort to interest one Soukup in trading for a larger tractor. Later on the same day, he went to a place in that county and became intoxicated. While in that condition, he started to drive back to Salina, and while so doing, operated his car in such manner as to force the Houdek car off the pavement with results which gave rise to these actions. Later that day, C. L. Clark, the county attorney of Saline county, talked with Mr. W. H. Oehlert, of the defendant company, in an apparent effort to find Gloyd. Mr. Apt, the court reporter, was present. We have carefully read all of their testimony as abstracted, and as bearing on the question now before us. About all that is shown is that Clark asked Oehlert if Gloyd worked for the company, and Oehlert said Gloyd sold equipment; that he asked Oehlert if he knew where Gloyd was on January 31, 1938, and Oehlert said Gloyd had been to Ellsworth. The county attorney's later testimony showed that Oehlert had seen Gloyd late in the day and that Gloyd had told him, Oehlert, he had been to see Soukup in Ellsworth county. Oehlert later testified he had not known Soukup, had not sent Gloyd to see him, and only knew he had been there when Gloyd told him.

It had been observed that the company had demurred to plain-

tiff's evidence, and when each party had rested his case, had moved for judgment. In that state of the trial, it asked the trial court to submit special questions, the answers to which it later asked to be stricken as not supported by the evidence. Plaintiff argues the company should not have asked to have the questions submitted if there was no evidence from which they could be answered. However logical that argument may be, if the company did not choose to stand on the demurrer, and probably it could not stand on the motion, it had to present its defense as best it could. By answers to questions not presently involved, the jury found that Gloyd sold used machinery for the company partly for commissions and partly for valuable considerations under special arrangements; that he was paid no salary and no expenses, and that he used his own automobile. Question 7 asked whether the company retained control or right of control of Gloyd as to territory or time, and the jury answered it did as to territory but not as to time, this answer being set aside as not supported by the evidence. By another division of the above question, the jury was asked whether the company controlled his transportation, and the answer, that it did "only by the very nature of the business," was set aside as not being an answer to the question. Question 8 was dependent on question 7. Question 9 was whether the company was interested only in Gloyd's efforts to sell machinery, and was answered "No." Question 10 was that if the answer to 9 was "No," what was the other interest, and the answer was in creating good will for the company. This answer was set aside as unsupported by the evidence, and accordingly the answer to Question 9 should be set aside. It may here be noted that the answer to Question 8, assuming the answer to Question 7 stood, was that the company retained the right to terminate its agreement with Gloyd whenever his services were found to be unsatisfactory. On the motion for judgment *non obstante veredicto*, the trial court found there was no conflict in the evidence with respect to the oral contract between the company and Gloyd, and as a matter of law the relation of master and servant did not exist.

Very complete briefs have been filed setting forth the views of both parties, reference being made to many authorities, and many more could be examined. (See, for example, the annotations in 20 A. L. R. 684, 54 A. L. R. 627, 61 A. L. R. 223, 75 A. L. R. 725, 126 A. L. R. 1120, and the A. L. R. Blue Book of Supplemental Decisions.)

As to whether the relation of master and servant exists, it may be stated that where, as here, the contract is oral, if there is no material conflict in the evidence, and the terms of the contract disclosed are not ambiguous or disputed, and only one inference can be drawn, the question is one of law for the court, otherwise it is one of fact for the jury. (See *Dohner v. Grocery Co.*, 116 Kan. 237, 226 Pac. 767; 27 Am. Jur. 539, § 60.)

A situation somewhat similar to that now before us was presented in *Hurla v. Capper Publications, Inc.*, 149 Kan. 369, 87 P. 2d 552, the appeal arising from rulings sustaining demurrers to the plaintiff's evidence. In the opinion, review is made of many authorities as to what constitutes the relation between parties so that liability follows if the relation of master and servant be established, and it was held:

"A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.

"A principal employing another to achieve a result, but not controlling nor having the right to control the details of his physical movements, is not responsible for incidental negligence while such person is conducting the authorized transaction. It is only when to the relationship of principal and agent there is added the right to control physical details as to the manner of performance which is characteristic of the relationship of master and servant that the person in whose service the act is done becomes subject to liability for the physical conduct of such agent." (Syl. ¶¶ 2, 3, 4, 5.)

In the above case reference is made to *Dohner v. Grocery. Co.*, supra, where it was held:

"A salesman who operates an automobile at his own expense, whose movements are not controlled by his employer, except that he shall make his territory once a week, is, with respect to the operation of the car, an independent contractor so that his employer is not answerable for injuries caused by his negligent operation of the car." (Syl. ¶ 2.)

Reference is also made to *McCraner v. Nunn*, 129 Kan. 802, 284 Pac. 603, where it was held:

"A dealer in automobiles, for whom another is engaged in selling automobiles on commission, who in driving his own car causes injuries to a stranger,

is not liable for the resulting injuries from negligent driving unless the relationship of master and servant or principal and agent exists between. the dealer and the driver and the driver is actually engaged at the time of the injury in furtherance of the business of the master or the principal." (Syl. ¶ 1.)

It is said by appellant that the three cases last noted were relied on by the company in the trial court and by the trial court in making its decision and he seeks to distinguish them by pointing out that in none of them was the right to discharge the person alleged to have been a servant, or to terminate the arrangement between the parties, considered as being an element of control. Eighty pages of his brief, with citation of many authorities, is devoted to a discussion of that phase of the matter. We have read carefully the matter. as presented in the briefs, and many of the cases quoted from or cited, but limits of space prevent any extended review of all of them to show applicability or lack of it or to distinguish them from the case before us.

In *Nelson v. Cement Co.*, 84 Kan. 797, 115 Pac. 578, the matter of right to discharge was mentioned in considering whether the relation of master and servant existed. A review of the facts was made showing a radically different situation than in the instant case, many authorities were cited, and it was held:

"Whenever the court can say from all the circumstances that the contractor is not independent of the owner and that the contract, whatever its terms, is only a colorable arrangement or device to enable the master to avoid liability to his servants for the failure to perform a duty which the law imposes upon him, the defense that the injury was caused by an independent contractor should not be permitted to prevail, and the failure to submit such defense to the jury will not be deemed error." (Syl. ¶ 4.).

In *Pottorff v. Mining Co.*, 86 Kan. 774, 122 Pac. 120, a written contract for the operation of a mine was involved under which the lessee was paid a certain price per ton for coal produced, but not permitted to sell the coal, and consideration was given to provisions permitting the lessor to determine the amount of production and whether the mine should be worked, and to terminate the contract in case of sale or if the manner of working it was not agreeable to the lessor. It was there held:

"When a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor.

"An independent contractor generally is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and

without being subject to control of his employer, except as to the result of his work.

"An employer may make himself liable by retaining the right to direct and control the time and manner or means of executing the work, although he may inspect and supervise it to the extent necessary to produce the result intended by the contract without incurring such liability.

"A contract between the owner of a coal mine and another party for its operation, is examined, and it is held that this party is not an independent contractor within the rules stated in the above paragraphs." (Syl. ¶¶ 1, 2, 3, 4.)

Another case cited by the plaintiff is *McKinstry v. Coal Co.*, 116 Kan. 192, 225 Pac. 743, arising under the workmen's compensation act. Defendant was operating a coal mine. Plaintiff furnished his own tools and equipment, and was paid for what he produced. The company defended on the ground plaintiff was an independent contractor. It was said in the opinion.

"Employees are often paid by the piece or quantity, generally known as piece work. The evidence shows that many miners in the vicinity of the mine in which the plaintiff was working were paid so much a ton for mining coal. Here, the plaintiff was paid so much a car. The plaintiff did not have to contract to do any certain amount of work any given number of days, to produce any definite number of cars or tons of coal, or to mine the coal from any particular place. The defendants could have discharged the plaintiff at any time for any reason whatever. *For the purpose of this case, wages may be appropriately defined as that which one pays to another for labor performed. That labor may be by the hour, by the day, by the week, by the month, or by the piece.* . . . If the contract had been to mine a certain amount of coal or to mine all the coal from a certain place, the contention of the defendant might be good; but that is not the situation. *The plaintiff was an employee within the meaning of the workmen's compensation act.*" (p. 193.) (Italics ours.)

Compare *Maughlelle v. Mining Co.*, 99 Kan. 412, 161 Pac. 907, another workmen's compensation case, where the company had contracted for operation of its mine, under a lease giving it the right to terminate under certain circumstances. Although that provision was quoted in the opinion, no weight seems to have been placed on it, nor that it prevented the relation of independent contractor found to exist as against an opposing contention the relation was that of master and servant.

Another case called to our attention is *Dobson v. Baxter Chat Co.*, 148 Kan. 750, 85 P. 2d 1, where the company claimed that the relation between itself and one White was that of master and servant. The evidence showed that White had no agreement to haul any particular number of loads; could work or not as he pleased; that he furnished his own truck and was paid by the load, but the com-

pany's foreman decided whether a truck driver was needed and should work, and he determined how long the company would keep a man and who should be employed. In the opinion, in considering all of the evidence, it was said that unrestricted right to end employment was an element of control.

Many cases cited go to the proposition that the relation existing between the parties may be proved by circumstantial evidence, as to which there is no doubt, or involve situations where the general question was whether or not control was exercised, and not to whether there was a right to discharge or to terminate the relationship, as, for instance, the recent case of *Moseman v. Penwell Undertaking Co.*, 151 Kan. 610, 100 P. 2d 669, where many of our former decisions are reviewed. Many decisions from other jurisdictions are cited, in which right to discharge has been mentioned as being an element to be considered in determining the relationship between two parties, but we need not review them in view of what is said later.

Essentially all that was shown by the evidence as outlined above, or that may be inferred from circumstances in many matters not detailed, was that Gloyd should have the right and privilege of selling such of the company's used machinery as he could to purchasers of his own choosing, his obligation being to account to the company for eighty-five percent of its list price. There was no agreement as to when he should commence operations, no agreement as to how or when he should work, no agreement when he should quit, he was not required to report in any manner to the company— the only stipulation with reference to time, place or manner was that he should not interfere with the operations of any regular salesman of the company. It is to be noted he was not to be paid any salary or any expenses or any commission. Whether Gloyd made nothing, little or much, depended solely on the amount he received from his purchaser over and above the amount he had to pay to the company. That was the arrangement. So far as evidence of what occurred under the arrangement is concerned, there is no evidence that Gloyd was ever told whom he was to see as a prospective purchaser, or that he was ever told to see any particular person. On one occasion, at least, Gloyd inquired whether he could contact a named person, but the only inference to be drawn from that would be that he wanted to learn whether that person had been approached by a regular salesman.

We are unable to find any evidence where Gloyd was ever employed to do anything—the arrangement shown was more nearly one giving him a right to do a certain thing if he chose. But assuming the arrangement did compel him to do something, so far as the company was concerned, it was only to achieve a certain result, get eighty-five percent of its list price on any used machinery which he sold; the arrangement did not give control or right to control Gloyd's physical conduct, unless by reason of its right to terminate the arrangement with Gloyd.

It may be conceded that in many cases from other jurisdictions, it has been held that the power to terminate the contract is an element tending to show control and that the person employed is not an independent contractor, and that provisions for cancellation, annulment or termination under specified conditions, have a tendency to show that the person employed was a mere servant. On the other hand, it has been held the relationship is to be determined from the surrounding indicia of control, and the sole circumstance that the employer has reserved the right of termination or cancellation does not necessarily make the contractor a servant. (See 27 Am. Jur. 501.)

In the case before us, there was no express right of termination; the company's officers did say that they could terminate, but when that testimony is considered with all of the other testimony, it cannot be said to be sufficient to compel the matter to be submitted to a jury. Leases and many other types of contract have specified terms and provisions for annulment, cancellation, termination, etc., but those inclusions do not make the relations of the parties to them that of master and servant—if that relation exists, it is because of other provisions. Other elements of control being shown, we think reservation of right to terminate is a proper element to be shown, but we cannot accede to any contention that it alone is evidence of the right of control and determinative of whether the relation of master and servant obtains.

It is also contended that the fact the evidence showed the company has paid the federal social security tax based on Gloyd's sales was such as to require the question to be submitted to the jury. Whether the company was legally obligated to pay social security tax on account of Gloyd was not an issue in this case and need not be discussed. Perhaps no weight should be given to Oehlert's explanation why the tax was paid. There may be cases arising where

the matter will be of importance, but in this case payment of the tax did not tend to show Gloyd was a servant any more than the fact it was not paid would have shown him to be an independent contractor. (See *Davis v. Julian,* ante, p. 749, 107 P. 2d 745, this day decided, a compensation case where a somewhat similar matter is treated.)

We are of opinion the relationship between the company and Gloyd was not that of master and servant or employer and employee, but that Gloyd was an independent contractor; that the trial court did not err in its rulings setting aside certain answers to special questions submitted, nor in rendering judgment in favor of the company, and its judgment is therefore affirmed.