No. 45,816

CLETE M. HUGHES, *Appellee*, v. WAYNE W. JONES d/b/a AAA HOME
TRAILERS, *Appellant*, and WILLARD D. HIXON, *Defendant.*

(476 P. 2d 588)

Opinion filed November 7, 1970.

*Byron J. Beck,* of Morrison, Hecker, Cozad, Morrison and Curtis, of Kansas City, Missouri, argued the cause, and *David R. Culp,* of the same firm, and *Robert D. Benham,* of McAnany, Van Cleave and Phillips, of Kansas City, were with him on the brief for the appellant.

*Barton Brown,* of Wallace and Saunders, of Overland Park, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a damage action for personal injuries received in an automobile accident which occurred on July 28, 1963, in Wyandotte County, Kansas, wherein the plaintiff sued the defendants, Wayne W. Jones d/b/a AAA Home Trailers and Willard D. Hixon, the driver of an automobile involved. In the lower court Hixon was never served with summons and made a party to the lawsuit. A separate trial to a jury on the issue of agency resulted in a jury verdict on February 7, 1967, finding Hixon to be the agent of Jones at the time the collision occurred. Thereafter a second trial to a jury on the remaining issues resulted in a verdict against the defendant Jones in the amount of $8,000 on November 6, 1968. Jones has duly perfected an appeal to this court.

The determinative question on appeal is whether the record discloses sufficient evidence to support the jury's finding that Hixon was the agent of Jones at the time the collision in question occurred.

The accident occurred at 12th and State Avenue in Kansas City, Kansas, between a 1954 Chevrolet automobile driven by Willard D. Hixon and a 1962 Ford Falcon driven by Lloyd Hughes. Clete M. Hughes (plaintiff-appellee) was a passenger in the Falcon automobile and the wife of Lloyd Hughes. The accident resulted from defective brakes on the 1954 Chevrolet, causing Hixon in the emergency created to swerve left across traffic proceeding in the opposite lane in an attempt to get off the street. A more detailed statement of the facts concerning the accident is not material to this appeal, except to note negligence on the part of Hixon was established by the evidence.

The facts giving rise to this case are rather involved. Wayne W. Jones (defendant-appellant) sells mobile homes at 4848 State Avenue, Kansas City, Kansas. In 1963 Jones was a licensed used car and mobile home dealer. At that time one license covered both occupations. In July, 1963, Roy Combs, a salesman for Jones, negotiated with Richard Patchen for the sale of a mobile home. Jones did not participate in the actual negotiations and did not talk or meet with Patchen until after the accident. As a salesman Combs was authorized to negotiate for the sale of a mobile home and enter into a written agreement with the purchaser.

The negotiations between Patchen and Combs resulted in an agreement whereby Patchen was allowed $300 for two automobiles, a 1953 Pontiac and a 1954 Chevrolet, as a down payment on a mobile home. Thereupon the parties entered into a written agreement dated July 27, 1963, entitled "Customer's Order for Mobilehome." The document describes a 1954 Magnolia mobile home thirty-eight feet in length and eight feet wide sold to Richard R. Patchen for the sum of $1,475. The initial down payment was shown as $300, and the unpaid balance together with the sales tax and insurance was to be paid in monthly installments over a period of thirty-six months in the sum of $46.24 each, beginning September 10, 1963. Specific terms written into the contract read as follows:

"1. Dealer agrees to deliver and set up trailer.

"2. *Purchaser agrees to deliver 1954 Chevy and 1953 Pontiac to dealer.*

"3. Dealer warrants equipment in trailer to work when delivered otherwise as is." (Emphasis added.)

At the bottom of the customer's order Patchen and his wife signed the agreement, and Roy Combs signed for AAA Mobile Home Co., Dealer. Under the signature of Combs is typed the words, "Approved Subject to acceptance by bank or finance company."

On the reverse side of this document it is headed, "Additional Terms and Conditions." At the top of this page over the heading it states, "This agreement is for the protection of both parties. *No changes permitted!*" (Emphasis added.) The material portion of the document concerning the additional terms then reads:

"It is further understood and agreed:

"The order on the reverse side hereof is subject to the following terms and conditions all of which have been mutually agreed upon:

"1. *The purchaser agrees to deliver* the original bill of sale or *the title to any used car,* mobilehome, trailer or vehicle traded in as partial payment, *along with the delivery of the said property to dealer's premises,* and does warrant that such car, mobilehome, trailer or vehicle to be his property, free and clear of all liens and encumbrances except as otherwise noted on the face of this instrument." (Emphasis added.)

At the bottom of this page the contract reads:

"This agreement contains the entire understanding between us and no other representation or inducement, verbal or written, has been made which is not set forth herein."

After the foregoing contract was signed by the parties, Patchen testified: "Combs said we had a deal, and it was my understanding it was a firm contract." Patchen then testified:

"Q. What arrangements were made at that time for you to get the cars over there to Triple A?

"A. As I started to leave, why, this salesman asked me if I could find somebody to bring them over, that they was busy and couldn't get away to come over after them.

"Q. And what did you say to that?

"A. I told him no, that I didn't have no license tags and I couldn't drive them without tags.

"Q. What did he offer to do then?

"A. Then he said—he went and got a dealer's tag and said to go ahead and use it, to have somebody bring it over.

"Q. Both cars, the Chevy and the Pontiac?

"A. Yes, just one dealer's tag but, you know, change it.

"Q. Did he want you to follow the man over, is that it, and take him home?

"A. Yes. See, I had to get somebody to drive them over and me follow them so they would have a way back.

"Q. But do I understand it, you were doing this at the request of Mr. Jones of AAA?

"A. Well, of AAA. He was there when the salesman give me the tags.

"Q. Mr. Jones saw Mr. Combs, the salesman, give you the tags?

"A. Why I don't see how he could have kept from it.

"Q. And he overheard the conversation that you were going to arrange for someone to bring the cars over to them?

"A. Yes, he was—he was sitting there. I couldn't definitely say he heard him, but he was there."

According to Patchen, he could not find anyone to drive the two automobiles to Jones' place of business on Saturday, July 27; but on Sunday, July 28, Patchen asked Willard D. Hixon to drive the cars over as a "favor." According to Patchen, Hixon never asked to be paid and Patchen did not promise to pay him. Hixon, on the other hand, testified by deposition that Patchen was to pay him for taking the cars over.

Before starting on the trip Patchen and Hixon checked the cars over and did not find anything wrong. They checked the gas, oil and added some brake fluid, since the master cylinder on the 1954 Chevrolet was a little low. Hixon then delivered the 1953 Pontiac from Patchen's place to Jones' used car lot and was followed by Patchen who brought him back. The dealer's tag of Jones was then taken from the Pontiac and placed upon the 1954 Chevrolet automobile and Hixon started driving it over to Jones' place of business with Patchen following some distance behind. The accident occurred enroute but was not witnessed by Patchen. Because of the accident the purchase of the mobile home fell through, and Patchen never saw the 1954 Chevrolet after it was towed off. Jones had never seen the 1954 Chevrolet.

According to Patchen, Jones did not know Hixon was going to drive the two cars over to his place of business, and no arrangement had been made for Jones to pay Patchen for delivering these two automobiles.

Hixon in his deposition testified he did not know Roy Combs or the defendant, Wayne W. Jones, and he had never worked for either or had anything to do with AAA Home Trailer. Hixon never talked to Jones following the accident, and said she would not know Jones if he saw him.

Jones admitted in his testimony on cross-examination that his dealer's tag was on the 1954 Chevrolet automobile involved in the accident; and that Combs had authority to sign the written document entered into between Patchen and AAA Home Trailers. He further testified:

". . . Subject to the approval of Patchen's credit application, the transaction was to be completed. I admit that three days following the accident I made the statement 'We loaned him one of our dealer tags so that he could bring the Chevrolet to us.' I had no knowledge prior to the accident that the dealer tags had been loaned. . . ."

On appeal the appellee asserts certain deposition testimony given by Jones which she contends was introduced on her behalf as an admission by Jones. In the deposition testimony of Jones, he said:

"A. Mr. Combs is my salesman.

"Q. (By Mr. Austin) And in making this transaction with Mr. Patchen, whatever he did, it was done in the scope of his employment, was it not?

"A. He was doing his duty, yes."

The appellant objected to the offer of this statement on the ground the interrogation of Mr. Jones prior to making the statement above quoted did not specifically outline what they were talking about—whether it concerned negotiations between Combs and Patchen for the sale of the mobile home, *or* Patchen's employ of someone to deliver the two automobiles of Patchen to the used car lot for and on behalf of Jones. The trial court admitted this evidence over objection, stating:

". . . Now, that doesn't preclude you [the appellant] from attempting to show by other testimony or other parts of the deposition what was intended, but I think he has a right to read this to the jury."

The theory upon which this case was submitted to the jury in the trial of this action on February 7, 1967, on the agency issue is stated in instruction No. 3. It reads:

"In order for plaintiff to hold defendant Jones liable for injuries she sustained in the collision here involved, plaintiff has the burden of proof to establish:

"(1) That Roy Combs directed Richard Patchen to deliver the 1953 Pontiac and the 1954 Chevy to the AAA Home Trailers place of business at 4848 State Avenue, Kansas City, Kansas, and authorized him to engage the services of some other person to assist in making such delivery.

"(2) That Roy Combs had the authority in his capacity as an employee of Wayne Jones, doing business as AAA Home Trailers, to direct Patchen to make such delivery and to authorize Patchen to engage the services of some other person to assist in making such delivery, and that Combs was acting within the scope of his authority as an employee of Jones when he undertook to make these arrangements with Patchen.

"(3) That Richard Patchen engaged Willard Hixon to drive the 1954 Chevy to the AAA Home Trailers place of business at 4848 State Avenue, Kansas City, Kansas.

"(4) That Willard Hixon was acting within the scope of his employment when the collision with the Hughes car took place.

"(5) That Wayne Jones had the right to control the physical conduct of Willard Hixon."

The jury adopted the appellee's theory on this issue and on the evidence submitted found Hixon to be the agent of Jones at the time of the collision here in question, and that Hixon was acting within the scope of his authority.

The instructions given to the jury on the trial of the agency issue are not challenged on appeal. Here the appellant asserts:

"The trial court erred in overruling defendant's Motion for a Directed Verdict at the close of plaintiff's case and at the close of all the evidence and defendant's Motions for Judgment n. o. v. filed on February 7, 1967, and November 6, 1968, for the following reasons:

"A. The evidence was insufficient as a matter of law to establish that defendant was liable for the acts of Willard Hixon since there was no substantial evidence that Willard Hixon was the agent, servant or employee of the defendant Wayne W. Jones, or that Willard Hixon was operating the 1954 Chevrolet automobile on business for or on behalf of defendant Jones or acting in the course and scope of his employment with defendant Jones or that defendant Wayne W. Jones had any right to control the actions of Willard Hixon."

In view of the jury's verdict on the issue of agency, the foregoing facts taken from the record have been related in their most favorable aspect to the appellee, who was the prevailing party.

On the record presented it cannot be said the so-called admission made by Jones in his deposition relative to Combs' authority constitutes an admission that Combs was authorized to direct Patchen to employ Hixon, or someone else, to deliver the two automobiles in question for and on behalf of Jones. Further review of the record on the issue of agency is not, therefore, precluded.

If there is any substantial evidence of an agency relationship existing between Jones and Hixon in the record, it must be found in the testimony of Patchen (the material portion of which has heretofore been quoted) because Combs was deceased at the time the agency issue was tried before a jury, and the trial court excluded his deposition testimony (another issue asserted by the appellant for reversal on appeal which we do not reach).

Under Kansas law the liability of a principal for the negligent acts of his agent is controlled by a determination as to whether, at the time in question, the agent was engaged in the furtherance of the principal's business to such a degree that the principal had the

right to direct and control the agent's activities. (*Karnowski v. Skelly Oil Co.,* 174 F. 2d 770 [10th Cir. 1949].) The liability is grounded upon the doctrine of *respondeat superior.* The power and control which the principal has over the agent is the primary factor to be considered. (*Jacobson v. Parrill,* 186 Kan. 467, 351 P. 2d 194; and 8 Am. Jur. 2d, Automobiles and Highway Traffic, § 616, p. 166.)

In *Rutkowski v. J. I. Case Threshing Machine Co.,* 126 Kan. 627, 270 Pac. 599, the court held the dealer involved was not responsible for the negligence of an expert, since the expert was selected and sent out by the defendant-manufacturer to set up a new combine and was paid by the defendant. In reaching this decision the court quoted the following from 39 C. J. 1269, 1270, with approval:

" 'To constitute the relation of master and servant for the purpose of fixing liability on the former for acts of the latter under the doctrine of *respondeat superior,* it is indispensable that the right to select the person claimed to be a servant should exist. Furthermore something more than the mere right of selection is essential to the relation. This right must be accompanied with the power and duty to control the alleged servant while in his employ; this, it is said, is one of the principal tests of the relation. . . . It is also essential to the relation of master and servant that the right to remove for unskillfulness, neglect of duty, or other cause, should exist.' " (p. 631.)

In Restatement, Second, Agency, § 220, it is said:

"(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

. . . . . . . . . . . .

"(*e*) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(*f*) the length of time for which the person is employed;

"(*g*) the method of payment, whether by the time or by the job;

"(*h*) whether or not the work is a part of the regular business of the employer;

"(*i*) whether or not the parties believe they are creating the relationship of master and servant. . . ."

Except for subparagraph (*i*) above, the foregoing portion of the Restatement of the Law of Agency was quoted and applied to the facts in *Sims v. Dietrich,* 155 Kan. 310, 124 P. 2d 507.

It is the appellee's theory that Jones' employee, Combs, solicited the services of Patchen to deliver two autmobiles to Jones' place of

business with the help of an undesignated person to be selected by Patchen and who ultimately was Hixon. The appellee argues the real key to right of control in the instant case is not that over Hixon directly, but that over Patchen, who secured Hixon's services; and that not only did Jones have the right to control (citing *Dobson v. Baxter Chat Co.*, 148 Kan. 750, 85 P. 2d 1), but that Jones actually exerted control over Patchen by Combs' directions to Patchen as follows:

"1. That Patchen secured someone to help him drive the automobiles (with the implication of necessity that such person be a driver);

"2. That the automobiles be delivered to defendant Jones' place of business;

"3. That defendant Jones' dealer tags be used in transporting the vehicles."

In the *Dobson* case the court sustained a personal injury judgment in favor of the plaintiff against the defendants, Baxter Chat Company, Vernon White and James White. The plaintiff was injured while a passenger in an automobile which collided with a truck owned by James White and driven by Vernon White, allegedly as the Baxter Company's agent. The Baxter Company's foreman hired James White with his truck to haul chat from a mine to a mill a few miles distant at an agreed price per ton paid by the Baxter Company. No directions were given to James White either as to the route to take, the manner of loading, the number of trips per day, or the time he should take in making the trips. On the date of the accident James White had rheumatism and secured the services of Vernon White to drive his truck, although no one connected with the Baxter Company suggested he do so. However, another Baxter Company employee, the shovel operator who loaded the trucks, knew Vernon White was driving the truck that day. On the day in question Vernon White, while on one of his trips between the mine and the mill, collided with the automobile in which the plaintiff was riding. The court held Vernon White was the employee of the defendant Baxter Company, pointing out that although the occasion did not arise for the exercise of control on this particular job, there was no indication the right of control was not there. In resolving the agency question the court pointed out that the Baxter Company had the same control over Vernon as over James. Among the authorities relied upon by the court was *Haluptzok v. Great Northern Ry. Co.*, 55 Minn. 446, 57 N. W. 144, 26 L. R. A. 739, which the court quoted as follows:

" 'If a servant who is employed to perform certain work for his master procures another person to assist him, the master is liable for the negligence of the latter only when the servant had authority to employ such assistant.

" 'But this authority may be implied from the nature of the work to be performed, or from the general course of conducting the business of the master by the servant; and it is not necessary that there should be an express employment of the person in behalf of the master, or that compensation be paid or expected. It is enough to render the master liable if the person guilty of the negligence was at the time in fact rendering service for him by his consent, express or implied.' " (p. 755.)

Here the analogy drawn by the appellee is that the Baxter Company's shovel operator knew Vernon White was driving the truck that day, while in the instant case, it is argued, Combs not only knew someone must be secured to drive, but specifically directed Patchen to secure someone.

The difficulty with the appellee's argument is in the relationship of Patchen to Jones. Combs, with whom Patchen was dealing, had fully completed the transaction by the signing of a written contract between Patchen and AAA Home Trailers. It was immediately after signing this contract that Patchen related the conversation he had with Combs as heretofore quoted.

The written contract entered into between Patchen and AAA Home Trailers was signed on behalf of Jones by Combs as an officer of the company. This contract is complete on its face, but subject to the approval of Patchen's credit application. In the written agreement Patchen specifically agreed to deliver the 1954 Chevrolet and 1953 Pontiac to the dealer, Jones. The written contract recited the agreement was for the protection of both parties and that *no changes were permitted.* Further, it recited that the entire understanding between the parties was contained in the written agreement, and that no other representation or inducement, verbal or written, had been made which was not set forth in the agreement. (See *Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 457 P. 2d 691.)

The contract in another provision further required Patchen to deliver the title to the 1954 Chevrolet and the 1953 Pontiac *along with the delivery of these vehicles to the dealer's premises.* While Patchen had previously shown his evidence of title to these vehicles to Combs during the negotiations, the record discloses the certificate of title to the 1954 Chevrolet was not received by Jones through the mail until sometime after July 28, 1963. The certificate of title

to the 1953 Pontiac was received by Jones on October 20, 1964. The title to the 1954 Chevrolet was in the name of Loren L. Gunnerson. On the reverse side of this certificate of title the assignment was attempted by the signature of Loren L. Gunnerson in blank without being notarized or dated.

The specific provisions in the written contract making it Patchen's obligation to deliver the two automobiles to the dealer's premises, and Patchen's acknowledgment immediately after signing the written contract that he understood the parties had a firm contract, require the testimony of Patchen to be viewed in the context of the whole situation. In so doing it cannot be said the testimony of Patchen concerning the conversation he had with Combs, immediately after signing the contract, discloses an intention or an understanding between the parties to *change* the written contract, and the conversation does not rise to the dignity of a subsequent agreement modifying the terms of the written contract. It is only by inference from Patchen's testimony that the appellee can take any solace in arguing that Jones assumed the obligation for delivery of the two vehicles to his premises. But in the face of the written contract, considering all of its terms and provisions in the context of the whole situation presented, the inference dissipates.

The fact the dealer's license plate of Jones was on the 1954 Chevrolet at the time of the collision is not a controlling factor on the issue of agency.

This is illustrated in *McCraner v. Nunn,* 129 Kan. 802, 284 Pac. 603. There the defendant motor company argued that the driver of one of the vehicles involved in the collision was not its agent, and therefore, it was not liable under the doctrine of *respondeat superior.* Evidence established the driver was engaged in selling cars for the defendant company on commission. He had purchased an automobile from the defendant for which he paid cash, and which he used in the selling of cars. The business arrangement between the defendant company and the driver was that the driver should operate his own car in selling automobiles and was to receive six percent commission on the sales made. He was to receive in advance $25 per week, and when the sales were made he was to be paid the difference between the amount of the commission earned and the sum advanced. Furthermore, the driver was to be furnished oil and gas up to the value of $15 per

month. *A dealer's license plate was attached to the driver's vehicle.* According to the driver who was a witness for the plaintiff, the defendant did not have a right to control the automobile he was operating, and he was allowed to hunt for his own prospects and go where and when he desired. On these facts, the court held the driver could not be regarded as an agent or employee of the defendant motor company.

While the evidence here is conflicting as to whether Patchen was to pay Hixon, there is no evidence that Jones was to pay Hixon, or that Jones was to pay Patchen. Hixon was selected by Patchen, and according to Hixon he was looking to Patchen for payment. This gave Patchen the power to tell Hixon what to do and how to do it. Since Jones had not employed Hixon and was not paying him, it would be improper under the evidence to say that Hixon was the servant of Jones and under his control. Jones, either on his own behalf or through Combs, had no power or opportunity to exercise control over Hixon because Jones could not discipline or discharge Hixon; nor could he subject, advise, instruct or give an order to Hixon with any expectation that such an order or instruction would be followed. Having selected Hixon, Patchen was the only person who had the power and right to control Hixon. Patchen not only had the power and right of control, but he exercised control over Hixon when he made the decision that the 1954 Chevrolet was safe for Hixon to drive and allowed Hixon to start on the trip.

Other cases holding the lack of an employer-employee relationship to exist between the defendant and the tortfeasors are: *Golden v. Southwestern Utilities Corp.*, 121 Kan. 793, 250 Pac. 286; *Redfield v. Chelsea Coal Co.*, 136 Kan. 588, 16 P. 2d 475; *Houdek v. Gloyd*, 152 Kan. 789, 107 P. 2d 751; and *Christensen v. Builders Sand Co.*, 180 Kan. 761, 308 P. 2d 69.

We find as a matter of law there was no substantial evidence to support the finding of the jury that Hixon was acting as the agent of Jones when the collision in question occurred.

The judgment of the lower court is reversed.