No. 34,475

CALVIN E. MOSEMAN and MARION A. MOSEMAN, *Appellees*, v. L. M. PENWELL UNDERTAKING COMPANY, *Appellant*.

(100 P. 2d 669)

Opinion filed April 6, 1940.

*J. J. Schenck* and *C. P. Schenck*, both of Topeka, for the appellant.

*Charles Rooney* and *Randal C. Harvey*, both of Topeka, for the appellees.

The opinion of the court was delivered by

ALLEN, J.: Emery Moseman, a boy twelve years of age, was struck and killed by a truck operated by one Lindeman. It was alleged in the petition that Lindeman was the servant of the defendant company and that the death of the boy was caused by the negligent operation of the truck by the driver, Lindeman. This action is by the parents of the deceased boy for damages sustained by reason of his death. Plaintiffs recovered judgment. Defendant appeals.

The petition alleged that defendant conducted a general funeral and undertaking business in Topeka; that the service they render in the conduct of a funeral includes the removal of flowers from the place where the funeral service is held and transporting them to the grave at the cemetery, and that such service is an integral part of the service rendered in the conduct of a funeral.

The petition further alleged that on the 20th day of October, 1937, at about 3:20 p. m., Emery Moseman was pushing his bicycle along the south curb line on East Eighth street about four feet north from the curbing in an easterly direction and at a point approximately thirty-five feet east of the east curb line of the intersection of East Eighth street and Chandler street; that upon the same date Emery Moseman was struck by a truck operated by one William F. Lindeman, who was at the time in the service and under the control and direction of the defendant, its agents and employees; that

William F. Lindeman in the pursuit of his employment and under the oral direction and order of the defendant, was transporting flowers from the funeral services of Owen J. Wood, deceased, from the Masonic Temple to the Topeka cemetery; that the truck was proceeding on East Eighth street in an easterly direction at a speed, to wit, in excess of sixty miles per hour, and that as the truck proceeded eastward on East Eighth street, and when it had reached a point midway between Branner and Chandler streets, the brakes were applied, sliding the wheels on the right-hand side of the truck; that the truck was approximately in the middle of the street, and as the truck proceeded eastward with the brakes on the right side of the truck locked, the truck veered slightly to the south; that after the truck had traveled a distance of 115 feet in the manner described, and at the point aforementioned it struck Emery Moseman and knocked or dragged him a distance of 50 feet eastward; that the blow struck Emery Moseman by the truck caused instant death; that the striking of Emery Moseman by the truck, at the time in the service of the defendant, was the proximate cause of the death of the boy, and was due solely to the negligence and carelessness of the driver of the truck, who at the time was the agent, servant and under the control and direction of the defendant, its agents and employees, and that the carelessness and negligence of the driver of the truck consisted of the following:

"1. In driving the truck at a rate of speed greater than was reasonable and proper, having regard for the traffic and use of the road and the condition of the road, and at a rate of speed such as to endanger the life and limb of other persons using the streets and highways in violation of the statutes of the state of Kansas, and particularly section 8-122 of the 1935 Revised Statutes of Kansas.

"2. In operating the said truck at a rate of speed in excess of twenty-five (25) miles per hour, to wit, in excess of sixty (60) miles per hour in violation of the ordinances of the city of Topeka, which provides as follows:

" '19-147. *Restrictions as to speed.* (a) Basic rule. No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway and the hazard at intersections and any other conditions then existing.'

"3. In failing to keep a proper lookout and to observe others using the street.

"4. In operating said truck with improper brakes.

"5. In failing to reduce the speed of said truck at sufficient distance from the intersection of Chandler and Eighth streets in accordance with the speed of said truck.

"6. In failing to turn the truck to the left to avoid striking said Emery

Moseman as he was at the point on the south side of said street near the curbing where he was struck as aforesaid.

"7. In failing to reduce the speed of the truck, turn the truck and avoid striking the said Emery Moseman when he was in a position of peril on the street from which he could not, with due care, have extricated himself."

The answer of defendant, after a general denial and certain admissions, specifically denied that Lindeman was on the date mentioned or at any other time the servant, agent or employee of the defendant; that the truck was owned by one Forrest Harrell and that Lindeman was an employee and servant of Harrell. The answer alleged that the death of Emery Moseman was caused by his own negligence—that shortly before the accident Emery was riding his bicycle in a westerly direction on the north side of Eighth street; that before reaching Chandler street he saw or by exercise of reasonable diligence could have seen the truck driven by Lindeman coming from the west and going in an easterly direction on the south side of Eighth street, yet, notwithstanding such fact, Emery made a "U" turn between intersections and without giving any signal, and in violation of the city ordinance, turned his bicycle from a westerly course in front of the truck driven by Lindeman. The answer set out in detail other alleged acts of negligence on the part of Emery Moseman.

The jury gave a verdict in favor of plaintiffs and returned answers to special questions. The special questions and answers are as follows:

"1. Who was the master of Lindeman, the driver of the truck in question at the time of the collision? A. L. M. Penwell Undertaking Co.

"2. Was Lindeman, the driver of the truck at the time of the collision, guilty of negligence which was the proximate cause of the death of Emery Moseman? A. Yes.

"3. If you answer the foregoing question in the affirmative, then state of what act or acts such negligence consisted. A. Excessive and unlawful speed.

"4. Was the deceased guilty of negligence which contributed to his death? A. No.

"5. If you answer the last foregoing question in the affirmative, then state of what act or acts such negligence consisted.

"6. What was the distance between the truck and the deceased (a) at the time that the driver of the truck first saw the deceased in the street; and (b) at the time that the deceased first saw the truck approaching? (a) Approximately one block. (b) 953½ feet.

"7. After the hat of the deceased blew off, state (a) what course he followed in crossing the street; (b) what direction he was proceeding immediately before he was struck by the truck; and (c) where he was with reference to the south curb of Eighth street at the time he was struck. A. (a) He made a semi-

circle turn to the left in the intersection of Chandler street and East Eighth street and went in a southeast direction toward the south curb of East Eighth street east of the intersection of East Eighth street and Chandler street. (b) East by south on the south side of East Eighth street. (c) About four feet north of the south curb of East Eighth street.

"8. At what rate of speed was the truck moving (a) at the time the brakes were first applied; and (b) at what location on East Eighth street was the deceased at that time? A. (a) At least 55 miles per hour. (b) On the south side of East Eighth street approximately in front of the house at 1103 East Eighth street.

"9. State what the condition of the brakes of the truck were immediately prior to the collision. A. Good.

"10. Was the deceased in the exercise of due care and caution for his own safety at and immediately prior to the time of the collision? A. Yes.

"11. Did Emery Moseman, at the time he alighted from his bicycle, know that the truck was approaching from the west at a rapid rate of speed? A. Yes.

"12. Could Emery Moseman, by the exercise of ordinary diligence, have kept out of the path of said truck and have avoided being struck? A. No.

"13. If you answer the last foregoing question in the affirmative, then state whether such failure on his part to exercise ordinary care and diligence, contributed to his death. A.

"14. Was there (a) a custom existing in this community on October 20, 1937, with reference to the transportation of flowers from the place of the funeral to the cemetery, and (b) if so, state what the custom was; and (c) did the funeral services rendered by the undertaker for which he received compensation, include the transportation of flowers from the place of the funeral to the cemetery? A. (a) Yes. (b) The custom was that the undertaker transported the flowers, or had them transported, from the scene of the funeral services to the cemetery. (c) Yes."

On this appeal defendant contends that the driver of the truck, Lindeman, was not the servant of the defendant at the time Emery Moseman was killed by the impact of the truck.

Forrest H. Harrell testified that he was a florist, doing business under the name of "Rosemary Gardens"; he was the owner of the truck in question; Lindeman had worked for him about a year and a half; the truck was used for the purpose of delivering flowers to customers and to funerals. When flowers were ordered for a funeral they were delivered at the place of the funeral; the undertaker in charge of the funeral ordinarily transports the flowers from the funeral to the cemetery.

Harrell testified that on the day of the funeral, Reilly, manager of the defendant company, called and said they had a lot more flowers at the Wood funeral than they could handle, and wanted to know if they could use Harrell's truck, to which Harrell consented;

that Reilly said: "You have your truck report to the Masonic Temple and park your truck under the fire escape and report to the Penwell company." Harrell testified that he sent Lindeman with the empty truck and directed him to follow the instructions of defendant; that he did not see the truck or the driver from that time until after the accident. When asked the question, "You considered the car out of your service from the time it left your place until it got back?" Harrell answered, "Absolutely."

Harrell further testified that about 5 or 5:30 o'clock on the afternoon of the accident Mr. Reilly, manager of defendant company, came to his place of business and said he was sorry about the accident, and stated, "There is nothing to worry about, as your truck and driver was in our service." That Reilly then stated that it was "no more than fair that Penwell & Company should offer the family free burial expenses, and everything."

The conversation between Harrell and Reilly was in the presence of Mrs. Harrell and Maxine Olson. Each of these parties testified that Reilly told Harrell that the truck and driver were in Penwell's service at the time of the accident.

Mr. Reilly, manager of the defendant company, testified: "The flowers at the grave are the same flowers used at the funeral. The undertaker assumes the responsibility of getting the flowers to the grave. We make one charge for the whole service. It is a part of the whole service. It is a part of the funeral." That the defendant company owned a small truck which was used for transporting flowers. At small funerals the flowers were all taken in that truck. At funerals where the small truck owned by defendant could not handle the flowers, the defendant would call florists to do the work.

The first question presented is whether Lindeman was the servant of defendant at the time of the fatal accident.

That a servant may be loaned or hired by his master to another for some special purpose and become the servant of such other person in performing such services is well settled.

Thus in 39 C. J., p. 1274, it is stated:

"A servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the party to whom he is loaned or hired, and to impose on the latter the usual liabilities of a master. The test of liability for the acts of the servant is whether in the particular service which the servant is engaged or requested to perform he continues liable to the direction and control of his original master or becomes subject to that of the person to whom he is lent or hired, or who requests his services.

It is not so much the actual exercise of control which is regarded as the right to exercise such control."

In *Phillips v. Armour & Co.*, 108 Kan. 596, 598, 196 Pac. 245, a transfer company furnished a motor vehicle and a driver to transfer employees of defendant to and from their homes. In holding the driver was the servant of defendant, the court said:

"Having taken upon itself the responsibilities of the transportation the defendant owed its employees the duty to inspect the instrumentalities used in it and to see that the traffic was as carefully conducted as if the vehicles had been owned by it or been driven by its foreman or other employees. The relation of master and servant existed and the defendant could not rid itself of responsibility for the safety of employees because the vehicles in which they were carried were owned by another."

In *Baker v. Petroleum Co.*, 111 Kan. 555, 560, 207 Pac. 789, it was said:

"It is well settled that the servant of A may for a particular purpose, or on a particular occasion, be the servant of B, though he continues to be the general servant of A and is paid by him for his work."

See, also, *Dobson v. Baxter Chat Co.*, 148 Kan. 750, 85 P. 2d 1; *Mendel v. Fort Scott Hydraulic Cement Co.*, 147 Kan. 719, 78 P. 2d 868.

In determining who is the master in these cases, the most satisfactory test is to ask, "Whose business was the servant performing, and under whose control?" (Mechem, Outlines of Agency, sec. 504.) A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master. (*Hurla v. Capper Publications, Inc.*, 149 Kan. 369, 87 P. 2d 552.)

The defendant had contracted to furnish the Wood family a complete funeral. This service included the transportation of the flowers from the place of the funeral to the cemetery. The defendant company requested Harrell to send a truck and driver to the place of the funeral to help transport the flowers to the cemetery. Clearly Lindeman in transporting the flowers was performing the business of the defendant—not of his general master, Harrell. He was subject to the control of defendant in the performance of that service. Under the evidence of the plaintiff it could not be said as a matter of law that in the performance of this service Lindeman was the servant of Harrell. As different inferences might be drawn from the testimony the matter was for the jury to determine. (*Baker v.*

*Petroleum Co.,* supra; *Nelson v. Cement Co.,* 84 Kan. 797, 115 Pac. 578; *Railway Co. v. Loosley,* 76 Kan. 103, 90 Pac. 990.)

Defendant asserts that our former rulings compel a determination that Lindeman was in the service of his general employer, Harrell. We think, however, careful analysis will disclose distinguishing factors in those cases. Thus, in *Laffery v. Gypsum Co.,* 83 Kan. 349, 111 Pac. 498, the laborer who was killed was in the service of an independent contractor. The defendant in that case neither controlled nor had the right of control over his physical conduct in the performance of his duties at the time of the fatal injury. In *Redfield v. Chelsea Coal Co.,* 136 Kan. 588, 16 P. 2d 475, one Land was driving a truck owned by Garland at the time of the collision in which plaintiff was injured. There was no evidence that Land was in the service or under the control of the defendant coal company. "The trouble with that theory here is that there is no evidence that Land was the agent of the coal company." In the later case growing out of the same accident (*Redfield v. Chelsea Coal Co.,* 143 Kan. 480, 54 P. 2d 975) the evidence "was little different" from the evidence in the former case. In *Dohner v. Grocery Co.,* 116 Kan. 237, 226 Pac. 767, while the salesman was the agent of defendant for the purpose of taking orders and making collections, it was held that he was not a servant subject to the direction of the defendant company in the operation of the company automobile on the highways. *Hurla v. Capper Publications, Inc.,* supra, came up on a demurrer to the evidence, and it was held that the evidence was insufficient to show that the relation of master and servant existed.

In the case before us Harrell loaned his servant to the defendant. He stated the truck was out of his service from the time it left until it got back. The manager of the defendant company stated, as shown by the testimony of Harrell and two other witnesses, that the "truck and driver was in our service." It was the duty of the defendant to transport the flowers from the place of the funeral to the cemetery. In assisting in this service Lindeman was not furthering the business of his general employer, Harrell, but of his temporary master, the defendant.

The jury found that Lindeman was the servant of the defendant at the time of the collision, and the evidence was sufficient to support the finding.

Was Emery Moseman guilty of contributory negligence? This question is argued at length by counsel for defendant. The jury in

answer to question four found the deceased boy was not guilty of contributory negligence, and in answer to questions six and seven made findings as to the facts immediately preceding and at the time of the fatal event. At the time the deceased first saw the truck, the truck was at a point 953½ feet east; after the boy's hat blew off he made a semicircle turn to the left in the intersection of Chandler and East Eighth streets and went in a southeast direction toward the south curb of Eighth street, east of Chandler street. These findings were supported by the evidence. We cannot say as a matter of law that a boy twelve years of age riding a bicycle, who sees a car approaching, 950 feet away, is guilty of contributory negligence in turning to the left and crossing the street. The evidence showed the boy had crossed the street in safety and was within a few feet of the south curb going east when the truck was a block west. He had turned east and had traveled east a distance of about 50 feet before the impact. We find no merit in this contention.

The court permitted the witness Morton to testify as to a statement made by Lindeman shortly after the collision. "He said they was not the Rosemary flowers—he was hauling them for Penwells." Defendant contends that agency cannot be proved by the declarations of the agent. This is a familiar rule of law. (*Richards v. Newstifter*, 70 Kan. 350, 78 Pac. 824; *Allison v. Borer*, 131 Kan. 699, 293 Pac. 769.)

But the rule also appears to be well settled that where the agency has been established by independent evidence, the declarations of the agent are competent to show that he acted as agent and not on his individual account, and to show the nature and extent of his authority. (2 C. J. 939; *Fritchen v. Jacobs*, 138 Kan. 322, 26 P. 2d 448.) As the relationship of master and servant was shown by the testimony hereinbefore outlined, we find no error in the admission of this testimony.

Several photographs of the deceased boy taken with other members of the family were introduced in evidence. It is urged that the effect of the photographs "was to inflame the minds of the jury and cause extreme passion and prejudice on the part of the jury in their deliberations in the jury room." Plaintiffs in their petition prayed for damages in the sum of $10,000. The jury returned a verdict for $5,000. It is not claimed the verdict is excessive. If passion and prejudice was generated by the photographs, the result was not reflected in the verdict. It is also suggested

that the photographs caused the jury to return untrue answers to special questions. We have examined the record and find the answers to such questions are supported by the testimony. There was no reversible error in the admission of the photographs.

The next complaint is that the court erred in refusing to give instructions requested by defendant. Five of these requested instructions pertain to the relationship of master and servant. This subject was covered by the instructions given by the court. Requested instruction No. 13 merely quoted section 47, chapter 283, Laws of 1937, which provides that no person shall turn a vehicle from a direct course on the highway unless such movement can be made with reasonable safety, etc. It had no application to the facts shown by the record and was properly refused.

Complaint is made of instructions 11, 14 and 23 given by the court. No. 11 set forth the duty of a person using a public street either as a pedestrian or as the driver of a truck or other vehicle, and the duty to use ordinary care under the circumstances of the situation; No. 14 stated the duty of a person driving a motor vehicle on a public street or highway to keep his car under control so that he could stop the car within the distance in which he can see ahead of him or to turn aside to avoid a collision. The objection to these instructions seems to be that they are not applicable to the facts. The objection is predicated on the assumption that the facts found by the jury, especially in answer to special questions 6 and 7, were not true. We think the facts found by the jury are supported by the evidence, and the objection to these instructions is without merit.

Instruction 23 stated the last-clear-chance doctrine in case the jury found the deceased boy was guilty of negligence. The jury, however, in answer to the special questions, found the deceased boy was not guilty of negligence. As the verdict was not based on the theory that deceased had negligently subjected himself to a risk of harm from the subsequent negligence of defendant's servant, the instruction became immaterial.

At the conclusion of the trial counsel for defendant requested the court to submit to the jury thirty-one special questions. Some of these questions were refused, others were modified and included in the fourteen questions submitted by the court. In *Snyder v. Eriksen,* 109 Kan. 314, 320, 198 Pac. 1080, it was said: "It is the function and duty of the court to shape and supervise the questions,

eliminating those that may be immaterial and submitting only inquiries as to ultimate facts on controverted issues." After a careful study of the requested questions, and those given by the court which covered in substance most of the questions requested, we cannot say the court, under the statute G. S. 1935, 60-2918, erred in refusing to submit questions requested.

We must therefore sustain the action of the trial court in overruling the demurrer to plaintiff's evidence and in refusing to direct a verdict for defendant. Finding no error in the record, the judgment must be affirmed. It is so ordered.

HARVEY, J., not sitting.