No. 35,667

A. C. LEATHERS, *Appellant,* v. P. L. DILLON and THE STATE AUTOMOBILE ASSURANCE ASSOCIATION, *Appellees.*

(131 P. 2d 668)

·Opinion filed December 12, 1942.

Russell L. Hazzard, of Dodge City, and C. G. Dennis, of Sublette, were on the briefs for the appellant.

George B. Powers, of Wichita, argued the cause, and Robert C. Foulston, George Siefkin, Samuel E. Bartlett, Lester L. Morris, Carl T. Smith, C. H. Morris and John F. Eberhardt, all of Wichita, were on the briefs for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This was an action to recover damages for injuries received when the automobile in which plaintiff was riding, and which was driven by one Vergil Jones, ran into a tractor parked on the edge of the highway. The appeal is from the order and judgment of the trial court in sustaining the demurrer of defendant to the evidence of plaintiff.

Defendant Dillon had a contract carriers' permit authorizing him to haul livestock. The defendant insurance company was his insurance carrier. On January 23, 1941, one Orville Tunis, a farmer living thirteen miles east of Sublette, employed Dillon to haul some sheep from the Tunis farm to the stockyards at Sublette. The next day Dillon sent two trucks and two drivers to the farm of Tunis. Dick Johnson was one of the drivers employed by Dillon.

The side roads were muddy, and to get the loaded trucks out of the Tunis farm it was necessary for Tunis to use his farm tractor. Orville Tunis, his son Vergil Tunis, and one Henry Doerkson, a farm hand working for Orville Tunis, accompanied the trucks to the stockyards at Sublette. They took a Ford pick-up truck along, which truck was owned by Orville Tunis and driven by Vergil Tunis. En route, one of the Dillon trucks broke its fan belt and consequently had no lights. The caravan reached the stockyards at Sublette at 8:30 p. m.

The stockyards are just north of highway 45. At this point the highway runs in a northeasterly direction. The black-top there is 22 to 24 feet wide.

As the trucks turned from the highway to enter the stockyards the lightless Dillon truck became stuck in the mud, and it was necessary to secure a tractor to extricate the stalled truck. Vergil Tunis and Henry Doerkson went to hunt a tractor. A tractor was borrowed from one Pennington. Doerkson drove the tractor back to the stockyards and Vergil Tunis drove the Tunis pick-up truck back of the tractor lighting its way. Johnson, Dillon's employee, hooked the lightless truck onto the tractor, and Doerkson, driving the tractor, pulled the truck out of the mud.

The sheep were then unloaded. The lightless Dillon truck then drove into the same mudhole, killed its motor, and had to be hauled out by the tractor a second time—Doerkson again operating the tractor. Doerkson then drove the tractor out on highway 45 headed west or southwest. He pulled the tractor to the right or north side of the highway and stopped it with the left wheels 1½ to 2 feet on the black-top. The tractor was 70 to 75 feet west of the entrance to the stockyards.

The tractor had no lights, and no flares were set. Vergil Tunis drove the Tunis Ford pick-up truck into the stockyards just north of the tractor, turned it around facing the tractor. The lights on the pick-up were burning and were turned toward the southwest, directly on the tractor. The tractor and Doerkson, who was driving it, were plainly visible to Orville Tunis who was in the stockyards and to Vergil Tunis sitting in the Ford pick-up truck.

In the meantime the lightless Dillon truck had been brought to a stop near the entrance to the highway from the stockyards—about 75 feet from the tractor. The second Dillon truck was just behind the lightless truck, and was headed in a southwesterly direction. The lights from the back truck were shining past the front truck and across the highway. This rear truck was about 15 feet north of the highway.

Plaintiff and Jones had been driving around town waiting for the conclusion of a basketball game, as they had dates after the game. They were in plaintiff's car and Jones was driving. Shortly before the collision, plaintiff and Jones drove out from the business section of Sublette on highway 45 past the stockyards, which are on the north side of the highway. As they went by the stockyards they noticed some trucks and lights over in the yards and supposed that someone was unloading some stock. As plaintiff and Jones went by the yards going out, there were no vehicles of any kind parked on the highway, no trucks parked near the highway and no truck lights shining across the highway. Plaintiff and Jones went on past the stockyards about a quarter of a mile, stopped and turned around and then started back to the business part of Sublette. They were driving about 30 to 35 miles per hour and on their own right-hand side of the road. As they approached the stockyards they noticed the lights of a truck shining across the highway, which truck was in the stockyards on the north side of the road. As they went on, plaintiff and Jones were watching this truck to see that it did not

come out on the highway in front of them. They testified that they could not see down the road past the lights that were shining across the highway in front of them. As they got near where the lights were shining across the road, the truck having those lights on it appeared to be some distance back from the highway. They testified that they were blinded by the lights shining across the highway; that they could not see on down the road, and that it took some time for their eyes to react and function normally. The tractor was a short distance on down the highway from where the lights were shining across the highway. After passing these bright lights shining across the highway, plaintiff and Jones were momentarily blinded and could not and did not see the tractor ahead of them and they drove straight on down the highway, well on their own side, and collided with the tractor. The injury to plaintiff was the result of this collision.

Plaintiff contends that Doerkson, the farm hand employed by Orville Tunis, was, while operating the tractor, the temporary servant of Dillon. On this point plaintiff cites and relies upon *Baker v. Petroleum Co.*, 111 Kan. 555, 207 Pac. 789; *Moseman v. Penwell Undertaking Co.*, 151 Kan. 610, 100 P. 2d 669, and *Smith v. Brown*, 152 Kan. 758, 107 P. 2d 718.

A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master. (*Hurla v. Capper Publications, Inc.*, 149 Kan. 369, 87 P. 2d 552.) We find no evidence in the record that defendant Dillon controlled or had the right of control of Doerkson, the farm hand of Orville Tunis. Tunis testified that Doerkson did not work for Dillon at any time. He further testified:

"It was tough sledding getting those loaded trucks from my yard out to the black-top, and took a long time. It was a little after sundown when we got to the highway. We turned our lights on before we reached the black-top, but one of Dillon's trucks broke a fan belt and didn't have any lights.

"We were all trying to get these sheep over to the stockyard and get them unloaded at the loading platform. We did not have all the sheep on the trucks that we wanted to move, and intended to go back after another load. It was to my interest, therefore, as well as everybody else's to get the trucks out of the mud and back on the road so we could go back and get more sheep.

"It was around 8:30 when the trucks got to the stockyard. It was January and dark, and the one truck got stuck. We all worked together trying to get it out. When we couldn't, we all discussed needing a tractor. My son knew Mr. Pennington and said he might be able to borrow his tractor. He and

Doerkson left in my pick-up and Doerkson drove the tractor back; my son drove the pick-up behind the tractor, lighting the way for the tractor."

While Doerkson drove the tractor which helped pull the Dillon truck out of the mud and parked the tractor on the highway, it is evident that he was performing the business entrusted to him by his general employer, Orville Tunis. There is no evidence that Dillon controlled or had the right to control the physical conduct of Doerkson. (*Redfield v. Chelsea Coal Co.*, 136 Kan. 588, 16 P. 2d 475; *Garner v. Martin*, 155 Kan. 12, 122 P. 2d 735.)

Plaintiff next asserts that Dillon was negligent in parking one of his trucks with its bright headlights shining across the highway a short distance from the tractor. As above stated, the Dillon truck that was without lights was stopped near the entrance to the highway from the stockyards. The second Dillon truck was just behind the lightless truck and was headed in a southwesterly direction. The lights were shining on the front truck and across the highway. The rear truck had stopped about 15 feet north of the highway— the tractor was parked about 75 feet down the highway.

The truck headlights were burning as required by law. The law did not require the driver of the truck to turn off his lights before entering the main highway, and he violated no duty that he owed the plaintiff in failing to turn off his lights. The law imposed on Jones, the driver of the car in which plaintiff was riding, the duty to keep his car under such control that he could stop in the assured clear distance ahead. *Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903; *Wright v. Nat'l Mutual Cas. Co.*, 155 Kan. 728, 129 P. 2d 249. Under the surrounding circumstances the driver of the Dillon truck was not required to anticipate that a traveler on the through highway, traveling at a speed of 30 to 35 miles per hour, would pass through the lights from the truck at the same speed and collide with the tractor parked 70 or 75 feet down the highway with only two feet of the tractor extending onto the black-top.

We think the demurrer to the evidence was properly sustained. The judgment is affirmed.