No. 45,229

CHARLES HACKER, *Appellee,* v. BROOKOVER FEED YARD, INC.,
a Corporation, *Appellant.*

(451 P. 2d 506)

Opinion filed March 8, 1969.

Ray H. Calihan, Jr., of Garden City, argued the cause, and Ray H. Calihan, Logan N. Green, and Daniel J. High, also of Garden City, were with him on the brief for the appellant.

Byron G. Larson, of Dodge City, argued the cause, and James A. Williams, George Voss and Ken W. Strobel, also of Dodge City, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This is a common-law action to recover damages for personal injuries suffered by the plaintiff, Charles Hacker, when he was struck by a scoop, or shovel, attached to a caterpillar tractor being operated by an employee of the defendant, Brookover Feed Yard, Inc. The case was tried to a jury which returned a verdict in favor of the plaintiff. Judgment was entered on the verdict and this appeal followed. For convenience we will refer to the parties either as plaintiff and defendant, or by name, as Hacker and Brookover.

In defending against this action, Brookover relied mainly on two theories: (1) That the plaintiff's exclusive remedy is under the Workmen's Compensation Act; and (2) that plaintiff is barred under the fellow-servant doctrine. These are the sole points presented on appeal, and we will discuss them in order. Before doing so, however, a recitation of the relevant facts is needed.

Brookover is engaged in feeding and finishing cattle for market. Although it feeds some cattle of its own, most of its business is feeding cattle for others under contract; it is a "contract feeder." The feeding time required from start to finish is usually 135 days. Brookover is paid five cents per head per day, plus cost of the feed and a markup for processing, rolling, mixing and getting the feed to the bunks.

Outside of molasses, which is trucked in and used as a supplement, most of the feed, including silage, alfalfa hay and grain is raised in the adjacent area. The defendant, itself, raises a small part of the feed and buys the remainder either under contract or on a day to day basis at market price.

All silage fed by Brookover, outside its own, is supplied by farmers within the general area, under written contracts with Brookover. These will be described in some detail later on. For the moment all we need to say is that the plaintiff, Hacker, at the time of his

injury, was employed by one Elmer Richmeier, a local farmer, with whom Brookover had contracted to buy 100 acres of silage in 1964. Hacker's job, so far as this action is concerned, was driving a truck used in delivering silage from Richmeier to pit silos located on defendant's feed lot. It was while he was so employed that Hacker was injured.

The circumstances of the accident were these: On the morning of September 19, 1964, plaintiff trucked two or three loads of silage to one of Brookover's silo pits. His testimony was that on reaching the feed yard he would weigh his load on the scales and be directed to the pit, or silo, which was then being filled. On arriving at the pit, he would wait his turn and then be directed by Randy Seay, a Brookover employee, to back into the pit where he would dump his load by raising the truck bed, at which time Randy would unfasten the tail gate.

During the morning, plaintiff became mired in the pit each time he dumped his load and had to be helped by a tractor operated by Joe Nichols, who worked for Brookover. Joe's job was to distribute and pack the silage, and assist trucks when they got stuck.

On the first occasion, a chain was hooked to the truck's front bumper, nearly pulling it off. After that, Hacker said to put the hook around the spring to save the bumper. This resulted in the chain getting tangled and a lot of time was wasted.

When the truck got stuck that afternoon, Hacker was asked where to put the hook. He got out of the truck and lay on the ground partly under the truck to point out where the hook should be attached. At this juncture, the tractor started forward and a scoop attached to the front end struck the plaintiff.

We turn to the first and principal point raised on appeal, namely, that Hacker's remedy is under the Compensation Act. In the trial court, this point was determined adversely to defendant as a matter of law. The respective positions of the litigants are these: Brookover contends that the delivery of silage to its feed yard was an integral part of its business which it had contracted to others, including Richmeier, making Hacker, in effect, a statutory employee under K. S. A. 44-503. Thus, it is argued, Hacker's exclusive remedy for the injury sustained while engaged in such work is under the Workmen's Compensation Act.

On the other hand, Hacker maintains that the relationship between his employer, Richmeier, and the defendant feed yard was

that of vendor and vendee; that Brookover's business was feeding cattle, not raising feed; and that in delivering feed to Brookover as Richmeier's employee he was not performing an integral part of Brookover's trade or business.

The statute on which Brookover relies, K. S. A. 44-503, reads in relevant part:

"(a) Where any person (in this section referred to as principal) undertakes to execute any work which is a part of his trade or business or which he has contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under this act which he would have been liable to pay if that workman had been immediately employed by him; . . ."

This statute and its application to various factual situations has been not only the cause of considerable litigation throughout the years but the subject of frequent opinions by this court, many of them being cited in Brookover's brief. Neither time nor space will permit a detailed analysis or comparison of our past decisions, nor would the luster of our reports be enhanced by so doing.

Without exception we have held that where the circumstances bring a case within the purview of K. S. A. 44-503, the injured workman becomes what is now known as a "statutory employee" whose sole and exclusive remedy is under the Workmen's Compensation Act. (*Hoffman v. Cudahy Packing Co.*, 161 Kan. 345, 167 P. 2d 613; *Hanna v. CRA Inc.*, 196 Kan. 156, 409 P. 2d 786.) The plaintiff concedes this to be true but he maintains the statute does not fit the facts of this case and hence is inapplicable.

Speaking generally, as we have indicated in past decisions, the key question to be answered in deciding whether 44-503 has application, is whether the work undertaken by the contractee is a part of the regular trade or business of the contractor or, in other words, whose work is being done? (*Lessley v. Kansas Power & Light Co.*, 171 Kan. 197, 231 P. 2d 239; *Coble v. Williams*, 177 Kan. 743, 282 P. 2d 425; *Bailey v. Mosby Hotel Co.*, 160 Kan. 258, 160 P. 2d 701.) This view coincides with the general rule set out in Larson's Workmen's Compensation Law, 1966, Vol. 1A, § 49.12, p. 859:

"Practically all cases of general interest interpreting this type of statute are addressed to one question: When is the subcontracted work part of the regular business of the statutory employer? . . ."

In *Hanna v. CRA Inc.,* supra, we endeavored to delineate the tests for gauging whether the work contracted comes within the contractor's principal business. We there said:

"This court has laid down two rather definite tests by which to determine whether the work covered by a contract is part of the principal's trade or business, *i. e.,* (1) is the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business? (2) is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal?

"If either of the foregoing questions is answered in the affirmative the work being done is part of the principal's 'trade or business,' and the injured employee's sole remedy against the principal is under the Workmen's Compensation Act." (pp. 159, 160.)

We need not, at this time, delve more deeply into the application of K. S. A. 44-503 generally, inasmuch as we believe the facts disclosed by the record before us bring this case within the ambit of our decision in *Bendure v. Great Lakes Pipe Line Co.,* 199 Kan. 696, 433 P. 2d 558, wherein we held:

"A sale and delivery of merchandise is not such a contractual relationship as is anticipated by K. S. A. 44-503 creating statutory employers and employees for the purpose of workmen's compensation." (Syl. ¶ 2.)

Briefly, the facts in *Bendure* were as follows: The plaintiff was a truck driver for Builders Steel Company, which had sold two steel I-beams to Great Lakes Pipe Line Company, subject to delivery at the latter's plant. The beams were to be used in the installation of some plant equipment by Great Lakes, the work being done by its own employees. During the unloading of the truck, to which the plaintiff was lending a helping hand, the plaintiff was injured, through the alleged negligence of an employee of the pipe line company. He then sued Great Lakes for damages. In upholding plaintiff's right to maintain the common-law action against Great Lakes, we said:

"We are forced to conclude that a sale and delivery of merchandise is not such a contractual relationship as is anticipated by K. S. A. 44-503. This court has not had occasion to pass on the specific question but the general rule would appear to be as stated. In 99 C. J. S., Workmen's Compensation, § 107, p. 369, we find the following statement in connection with the statutory relationship:

" 'The compensation act does not apply where the transaction between the immediate employer and the person sought to be held liable as his employer is that of purchase and sale, . . .'

"The rule stated is subject to the exception that when the contract to sell is accompanied by an undertaking by either party to render substantial services in connection with the goods sold, that party is a contractor within the meaning

of the statute. The rule is also subject to the exception that the transaction must not be a mere device or subterfuge to avoid liability under the Workmen's Compensation Act. . . ." (p. 702.)

The defendant attempts to distinguish this case from *Bendure* on two grounds: First, that there was a written contract between Richmeier and itself; and second, the contract calls for substantial services, thus bringing the case within the first exception noted in *Bendure*. There is no contention the transaction between Richmeier and Brookover was a subterfuge.

Before we answer these contentions, a short look at the Richmeier contract would seem in order. In the agreement, Brookover agrees to purchase 100 acres of an early maturing hybrid corn which will make good quality silage; the corn to be planted in rows of 36 inches or wider; to be harvested at approximately 65% moisture; to be field chopped fine, weighed over Brookover scales and dumped into the silo; Brookover is to pay $7 per ton delivered to the silo; and if the forage is not of good quality, Brookover has the option to turn it down or agree on a different price.

In our opinion the agreement, although in writing, was nothing more than a contract, executory in character, providing for future sale of silage (*Schoonover v. Igleheart,* 163 Kan. 689, 186 P. 2d 109) and the relationship created between Richmeier and Brookover was simply one of prospective vendor and purchaser. In our judgment, the delivery of a truck load of silage to the defendant's pit silo and its acceptance by the defendant would constitute as valid a sale under their agreement, and no more, as did the transaction in *Bendure*.

The defendant infers, because the silage had to be produced by Richmeier and dumped into Brookover's silo, that this case fits into the exception mentioned in *Bendure, i. e.,* a sale accompanied by an undertaking to render substantial services in connection with the product sold. We think the inference is unjustified. In Bendure, we carefully refrained from defining "substantial services" or when, how and where the performance thereof would be required to bring a case under the exception, and we do not propose to generalize here. Unsatisfactory though the method may be, this is an area in which each case will have to be judged very largely on its own facts and attendant circumstances.

It might prove helpful, however, to mention some of the concurring factors which have been considered in reaching our decision. Richmeier is an independent farmer. The corn crop was

raised entirely on land either owned by him or under his control, not under Brookover's dominion. Richmeier's equipment was used and he employed his own labor. So far as the record is concerned, we may assume that Richmeier furnished the seed, and that title to the crop remained in Richmeier until the silage was dumped into the silo. It was Richmeier who took the risk of a crop loss; it was Brookover who could refuse the silage should it fail to measure up to requirements. The crop was not only planted and raised to maturity on Richmeier's land, but it was harvested and cut into silage on his land as well; none of the work took place on Brookover's premises.

Brookover suggests that since it produced some silage of its own on land which it leased, the production of feed was part of its regular business. We think this result does not follow. The silage raised by Brookover was minimal in amount. In 1964 Brookover contracted with eight individual farmers, including Richmeier, for the silage needed in its feeding operations that year. Together, the farmers sold Brookover twenty-one thousand seven hundred and eighty-two (21,782) tons of fodder, as against three thousand three hundred forty-three (3,343) tons raised by Brookover.

It is obvious from defendant's own evidence that Brookover's primary business is feeding cattle, not producing ensilage, and that Brookover must depend on local purchases in meeting its feed requirements. Nor is Brookover in the business of hauling ensilage, as one of its officers pointed out. Mr. Richmeier's production of ensilage on his own farm, from his own corn raised from his own seed, was a process preliminary to Brookover's feeding operations, not central thereto. The delivery of the finished product to Brookover's silo consummated the sale provided for in the written agreement. That the contract was reduced to writing in this case, rather than being oral, as in *Bendure*, provides no basis for distinguishing the two cases.

Our research has uncovered no case which is identical to the present action. We find some similarity, however, in *Schafer v. Kansas Soya Products Co.*, 187 Kan. 590, 358 P. 2d 737, an action brought under the wrongful death statute. The decedent, a truck driver, picked up a load of soybeans for his employer, Kumle, and delivered it to defendant's elevator. After driving onto the scale as directed, the decedent got out of his truck and the defendant's employees began to unload the soybeans by means of a power-driven hoist. In the process of unloading, the truck rolled back

down the platform and struck the decedent, who was standing at the rear.

It was urged, in defense of the action, that the decedent was a "statutory employee" of the defendant company within the contemplation of K. S. A. 44-503 and that the plaintiff's exclusive remedy was under the Workmen's Compensation Act. This court, in denying such contention, said that the underlying premise on which liability under 44-503 is predicated is the existence of a contract between two employers; that the decedent was employed to do but one thing *i. e.,* deliver the soybeans to defendant; and there was nothing to indicate that the defendant had contracted with either Kumle or the decedent for the latter to do any part of the defendant's work.

We find a somewhat more analogous situation in the lumbering or logging business where a mill owner contracts with a "custom logger" to pay the latter an agreed sum for logs to be cut and delivered at the mill. It has been held, where the stumpage is owned by the logger and he uses his own equipment and employs his own labor, that the contract is one of purchase and sale, and the relationship that of vendor and vendee, rather than employer and employee under the Workmen's Compensation Act. (*Alexander v. Clemons Brothers Lumber Company,* 135 So. 2d 477 [La.]; see, also, *Smith v. Crossett Lumber Co.,* 72 So. 2d 895 [La.]; and *Benton v. Pope,* 130 So. 2d 724 [La.].)

The situation with which we are now confronted is easily distinguishable from that presented to us in *Watson v. Dicky Clay Mfg. Co.,* 202 Kan. 366, 450 P. 2d 10. In that case the seller, Dickey Clay, sold its products at a delivered price and contracted with a trucking concern to deliver them on an agreed basis. The plaintiff, a truck driver operating under the contractee, was injured through the alleged negligence of a Dickey Clay employee while the truck was being loaded at the Dickey Clay plant. He brought an action for damages against Dickey Clay, the *seller,* not against the *purchaser.* We held in that case that the delivery of merchandise to its buyers was part of the *seller's* business which had been contracted to a third party, and that plaintiff's exclusive remedy was under the Workmen's Compensation Act, and not by means of a common-law negligence action. (See, also, *Swift v. Kelso Feed Co.,* 161 Kan. 383, 168 P. 2d 512.)

Brookover's final point is that the trial court erred in refusing to instruct the jury on the fellow-servant doctrine. This argument is

based on the contention that Joe Nichols, who drove the tractor causing the injury, was Hacker's co-employee and hence that Hacker is barred from recovery. The essence of the fellow-servant rule is that, ordinarily, an employer is not liable to an employee for injuries due solely to negligence on the part of his co-employees who are engaged with him in the common work of their common employer. (*Bridge Co. v. Miller*, 71 Kan. 13, 80 Pac. 18; *Carter v. Uhrich*, 125 Kan. 192, 264 Pac. 31; *Taylor v. Hostetler*, 186 Kan. 788, 352 P. 2d 1042; 35 Am. Jur., § 334, p. 760.)

Before this doctrine can be applied, it is essential to show as a prerequisite, that a common employer is involved. That such a requirement must be met is apparent from the very cases cited by the defendant. We have already held that Hacker was not a "statutory employee" of Brookover, as the defense has contended, and there is no evidence whatever in the record that he had ever been hired by Brookover, for any purpose.

However, the defendant suggests that Hacker was a "loaned employee" of Brookover, citing *Moseman v. Penwell Undertaking Co.*, 151 Kan. 610, 100 P. 2d 669, to support this position. The facts in Moseman are entirely unlike those here. A Topeka florist provided the defendant Penwell, at the latter's request, with a truck and driver for Penwell's use in transporting flowers from the Masonic Temple to the cemetery following a funeral service. The evidence showed it was Penwell's responsibility to transport the flowers as part of the funeral service, and the driver of the florist's truck was instructed to follow Penwell's instructions. On the way to the cemetery, the truck struck and killed Emery Moseman, a twelve year old boy, whose parents later brought suit against Penwell. The court held that the evidence established the relationship existing between Penwell and the driver of the florist's truck to be that of master and servant. We agree. However, there is no evidence of like import in this case, and Moseman has no relevance to the instant situation.

There is no evidence from which it may be inferred that Hacker had been "loaned" to Brookover to assist in Brookover's feeding business. Hacker's job was to deliver silage to the feedlot and dump the same into Brookover's silo. In attempting to return to Richmeier's farm, ostensibly for another load, he became stuck, and Brookover's men and equipment attempted to help him. If anyone might be said to have been a "loaned employee," it would

seem more logical to imply such a status to Brookover's employees in relation to Richmeier, while the former were engaged in an attempt to free Richmeier's truck from the mire. We believe the trial court did not err in declining to instruct on the fellow-servant doctrine.

No error appears and the judgment of the trial court is affirmed.